Slip Op. 15 - 53

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>UNITED STATES,<br><br>　　　　　Defendant. | Before: Donald C. Pogue,<br>　　　　　Senior Judge<br><br>Court No. 13-00346 |

<u>OPINION and ORDER</u>

[remanding in part the Department of Commerce's determination of company-specific revocation of antidumping duty order]

Dated: June 5, 2015

<u>Andrew W. Kentz</u>, <u>Jordan C. Kahn</u>, and <u>Nathaniel Maandig Rickard</u>, Picard Kentz & Rowe LLP, of Washington, DC, for the Plaintiff.

<u>Joshua E. Kurland</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant.  Also on the brief were <u>Joyce R. Branda</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant Director.  Of counsel on the brief was <u>Melissa M. Brewer</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

**Pogue, Senior Judge:**  This action arises from the

seventh administrative review by the U.S. Department of Commerce

("Commerce") of the antidumping duty ("AD") order on certain

frozen warmwater shrimp from the People's Republic of China

("PRC" or "China").[1]  In this review, Commerce determined to
revoke the order with respect to respondent Zhanjiang Regal
Integrated Marine Resources Company, Limited ("Regal").[2]
Appealing Commerce's determination, Plaintiff Ad Hoc Shrimp
Trade Action Committee ("AHSTAC") – an association of domestic
warmwater shrimp producers that participated in this review[3] –
claims that Commerce's revocation was in error.[4]  Specifically,
AHSTAC challenges (1) Commerce's reliance, in concluding that
Regal was eligible for company-specific revocation, on data and
analysis that were previously held not to have been based on a
reasonable reading of the record evidence because, *inter alia*,
the agency arbitrarily ignored economic comparability in its
evaluation of factor of production data; and (2) Commerce's
determination to disregard discrepancies between Regal's
verified sales data and the entry information provided by U.S.
importers in concluding that the continued application of the AD

---

[1] See Certain Frozen Warmwater Shrimp from the People's Republic
of China, 78 Fed. Reg. 56,209 (Dep't Commerce Sept. 12, 2013)
(final results of administrative review; 2011-2012) ("AR7 Final
Results") and accompanying Issues & Decision Mem., A-570-893,
ARP 11-12 (Sept. 12, 2013) ("AR7 I&D Mem.").

[2] AR7 Final Results, 78 Fed. Reg. at 56,210.

[3] See Compl., ECF No. 2, at ¶ 7.

[4] See [Conf. & Pub.] Mem. of L. in Supp. of [AHSTAC]'s USCIT Rule
56.2 Mot. for J. on the Agency R., ECF Nos. 41 (conf. version)
& 42 (pub. version) ("Pl.'s Br.").

order to Regal's merchandise was not necessary to offset
dumping.[5]

     The court has jurisdiction pursuant to
Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as
amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[6] and 28 U.S.C.
§ 1581(c) (2012).

     As explained below, Commerce's reliance, without
reconsideration or additional explanation, on data and analysis
from the fifth review of this AD order – despite this Court's
prior holding that these same determinations were not based on a
reasonable reading of record evidence, and despite material
differences between the record of that proceeding and this
revocation inquiry – is remanded for reconsideration.  On the
other hand, Commerce's decision to disregard any discrepancy
between Regal's verified sales data and the entry information
provided by importers was reasonable, and is therefore
sustained.

## BACKGROUND

     Antidumping duty orders are imposed on imported

---

[5] Id.

[6] Further citations to the Tariff Act of 1930, as amended, are to
the relevant provisions of Title 19 of the U.S. Code,
2012 edition.

merchandise that is sold at prices below normal value (i.e., "dumped"), where "normal value" is usually the price at which like products are sold in the exporting country or, for merchandise originating in non-market economies ("NMEs"), a value calculated using appropriate surrogate market economy data.[7]  Such orders are regularly reviewed by Commerce, such that the agency determines producer/exporter-specific dumping margins, covering discrete (typically one-year) time periods, by making contemporaneous normal value to export price comparisons.[8] Pursuant to a regulation in effect at the time of the administrative review at issue here, Commerce was authorized to revoke the AD order with respect to particular exporters/producers after considering whether (A) such an exporter/producer had "sold the merchandise at not less than normal value for a period of at least three consecutive years"; (B) such exporter/producer (if previously determined to have sold the merchandise at less than normal value) "agrees in writing to its immediate reinstatement in the order, as long as any exporter or producer is subject to the order, if [Commerce] concludes that the exporter or producer, subsequent to the

---

[7] See 19 U.S.C. §§ 1673, 1677b(a)(1)(B)(i), 1677b(c).

[8] See id. at § 1675(a).

revocation, sold the subject merchandise at less than normal

value"; and (C) whether "the continued application of the

antidumping duty order is otherwise necessary to offset

dumping."[9]

Pursuant to this regulation, Regal requested company-

specific revocation, citing its zero percent dumping margins in

the fourth and fifth administrative reviews (and its expected

zero percent dumping margins in the sixth and seventh reviews),

and certifying in writing its agreement to its immediate

reinstatement under the order should Commerce determine in the

future that Regal is selling subject merchandise to the United

States at prices below normal value.[10]  By the time of Commerce's

_____

[9] 19 C.F.R. § 351.222(b)(2)(i)(A)-(C) (2012). This regulatory
provision was subsequently revoked for administrative reviews
initiated on or after June 20, 2012. Modification to Regulation
Concerning the Revocation of Antidumping and Countervailing Duty
Orders, 77 Fed. Reg. 29,875, 29,876 (Dep't Commerce
May 21, 2012).  As the review at issue here was initiated on
April 30, 2012, the regulation was still in effect.
See Initiation of Antidumping and Countervailing Duty
Administrative Reviews and Request for Revocation in Part,
77 Fed. Reg. 25,401, 25,403 (Dep't Commerce Apr. 30, 2012).

[10] See AR7 I&D Mem. cmt. 2 at 6; Req. for Admin. Review
& Revocation, Certain Frozen Warmwater Shrimp from the People's
Republic of China, A-570-893, ARP 11-12 (Feb. 28, 2012),
reproduced in [Conf. & Pub.] App. to Def.'s Resp. in Opp'n to
Pl.'s Mot. for J. Upon the Agency R., ECF Nos. 55 (conf.
version) & 56 (pub. version) ("Def.'s App.") at Tab 1
("Revocation Req.") at 2-3 & Attach. 1.  At the time of Regal's
request for revocation, the seventh review had not yet been
initiated, and the results of the sixth review had not yet been
(footnote continued)

decision regarding this revocation request, Regal had been

individually examined in the sixth and seventh reviews, and

received zero percent dumping margins in both proceedings.[11]

Regal was not, however, individually examined in the fifth

---

finalized, although Regal had been preliminarily assigned a zero
percent margin in the sixth review. <u>Revocation Req.</u>, ECF Nos. 55
& 56 at Tab 1, at 3.

[11] Where it is not practicable to make individual weighted
average dumping margin determinations for each known exporter
and producer of the subject merchandise for whom review was
requested, Commerce may limit its individualized examination to
a smaller number of companies, 19 U.S.C. § 1677f-1(c)(2), and
assign to the remaining respondents the "all-others" rate
(calculated in accordance with 19 U.S.C. § 1673d(c)(5)) or,
where appropriate, the NME countrywide rate. <u>See</u> <u>Jiangsu</u>
<u>Jiasheng Photovoltaic Tech. Co. v. United States</u>, __ CIT __,
28 F. Supp. 3d 1317, 1339-40 n.107 (2014).  Regal was
individually examined in the sixth and seventh administrative
reviews of this order. <u>Certain Frozen Warmwater Shrimp from the</u>
<u>People's Republic of China</u>, 77 Fed. Reg. 12,801, 12,801 (Dep't
Commerce Mar. 2, 2012) (preliminary results, partial rescission,
extension of time limits for the final results, and intent to
revoke, in part, of the sixth antidumping duty administrative
review) (explaining that Commerce selected Regal for individual
examination in the sixth review) (unchanged in 77 Fed. Reg.
53,856 (Dep't Commerce Sept. 4, 2012) (final results, partial
rescission of sixth antidumping duty administrative review and
determination not to revoke in part) ("<u>AR6 Final Results</u>"));
Decision Mem. for Prelim. Results, Partial Rescission of
Antidumping Duty Admin. Review, <u>Certain Frozen Warmwater Shrimp</u>
<u>from the People's Republic of China</u>, A-570-893, ARP 11-12
(Mar. 12, 2013) at 3 (explaining that Commerce selected Regal
for individual examination in the seventh review) (adopted in
78 Fed. Reg. 15,696, 15,696 n.1 (Dep't Commerce Mar. 12, 2013)
(preliminary results of administrative review; 2011-2012)
(unchanged in <u>AR7 Final Results</u>, 78 Fed. Reg. 56,209)).

review,[12] in which it was assigned a zero percent dumping margin
based on its individually-calculated zero percent rate in the
previous (fourth) review.[13]  Because Regal was not individually
examined in the fifth review, Commerce requested from Regal
information and sales data from the time period covered by that
review, "to confirm that Regal did not dump during that time,"[14]
and hence to confirm that Regal did not dump for three
consecutive years, as required for revocation eligibility under
the regulation.[15]  Finding that Regal's fifth review sales data
confirmed that Regal did not sell subject merchandise at less
than the normal values calculated during that proceeding,
Commerce concluded that Regal satisfied this regulatory
requirement.[16]  As explained below, AHSTAC now challenges this

---

[12] Certain Frozen Warmwater Shrimp from the People's Republic of
China, 76 Fed. Reg. 8338, 8341 (Dep't Commerce Feb. 14, 2011)
(preliminary results and preliminary partial rescission of fifth
antidumping duty administrative review) (explaining that
Commerce selected only one company for individual examination in
the fifth review, which was not Regal) (unchanged in
76 Fed. Reg. 51,940 (Dep't Commerce Aug. 19, 2011) (final
results and partial rescission of [fifth] antidumping duty
administrative review) ("AR5 Final Results")).

[13] See AR5 Final Results, 76 Fed. Reg. at 51,942.

[14] AR7 I&D Mem. cmt. 2 at 6.

[15] See 19 C.F.R. § 351.222(b)(2)(i)(A).

[16] [Commerce's] Post-Prelim. Analysis for [Regal] and [Another
Resp't], Certain Frozen Warmwater Shrimp from the People's
Republic of China, A-570-893, ARP 11-12 (May 20, 2013),
                                          (footnote continued)

finding in so far as it relies, without additional analysis, on comparison values from the fifth review that were held by this Court to require reconsideration.[17]

AHSTAC's first challenge is directed at Commerce's decision to compare Regal's sales data for the period covered by the fifth administrative review[18] with the normal values calculated during that proceeding.[19]  Because Commerce considers China to be a non-market economy, these normal values were based on "the value of the factors of production utilized in producing the merchandise," including "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses" (collectively, the "FOPs"), in a surrogate market economy country.[20]  Commerce's selection of the primary surrogate

---

reproduced in Def.'s App., ECF Nos. 55 & 56 at Tab 7 ("Regal Post-Prelim. Mem.") at 6 (unchanged in the AR7 Final Results, 78 Fed. Reg. at 56,210).

[17] Pl.'s Br., ECF Nos. 41 & 42, at 13-22.

[18] The period of review for that proceeding was February 1, 2009, through January 31, 2010. AR5 Final Results, 76 Fed. Reg. at 51,940.

[19] See Regal Post-Prelim. Mem., ECF Nos. 55 & 56 at Tab 7, at 3.

[20] See 19 U.S.C. § 1677b(c)(1); Regal Post-Prelim. Mem., ECF Nos. 55 & 56 at Tab 7, at 3.  Although the statute permits Commerce to source its data from multiple surrogate market economies, see 19 U.S.C. § 1677b(c)(1), Commerce normally values all factors of production using data from a single surrogate market economy country (the "primary surrogate country"). See 19 C.F.R. § 351.408(c)(2); Clearon Corp. v. United States,
(footnote continued)

country for the fifth review period was successfully challenged

by AHSTAC in that original proceeding.[21]  Now AHSTAC again

challenges this same determination, as reiterated in the context

of Commerce's examination of Regal's fifth review prices, as

part of the agency's evaluation of Regal's revocation request.[22]

Specifically, in the original fifth review, Commerce

used Indian data to value the FOPs for its normal value

calculation.[23]  AHSTAC challenged this decision, arguing that

record data from Thailand, rather than India, provided the best

available information for the normal value calculation.[24]

Responding to AHSTAC's challenge, this Court remanded Commerce's

---

Slip Op. 13-22, 2013 WL 646390, at *6 (CIT Feb. 20, 2013)
(noting that Commerce's "preference for the use of a 'single
surrogate country'" is reasonable because, "as Commerce points
out, deriving the surrogate data from one surrogate country
limits the amount of distortion introduced into its
calculations").

[21] See Ad Hoc Shrimp Trade Action Comm. v. United States,
__ CIT __, 882 F. Supp. 2d 1366, 1376 (2012) ("China Shrimp
AR5").

[22] Pl.'s Br., ECF Nos. 41 & 42, at 13-22.

[23] Issues & Decision Mem., Certain Frozen Warmwater Shrimp from
the People's Republic of China, A-570-893, ARP 09-10
(Aug. 12, 2011) (adopted in AR5 Final Results, 76 Fed. Reg.
at 51,940) ("AR5 I&D Mem.") cmt. 2 at 10.

[24] China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1372;
see 19 U.S.C. § 1677b(c)(1) (requiring that Commerce use the
"best available information" in selecting appropriate surrogate
FOP values when calculating the normal value of NME
merchandise).

determination to use Indian surrogate data in the fifth review,

"[b]ecause Commerce's stated reasoning regarding the surrogate

country selection in this review does not comport with a

reasonable reading of the record."[25]  On remand, however, the

question was rendered moot when the sole individually-examined

respondent was found to be non-credible and uncooperative, and

accordingly was assigned, based on adverse facts available,[26] a

rate derived from the domestic industry's petition to impose

this AD order.[27]  "As a result, [Commerce] did not . . .

---

[25] China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1376.

[26] See 19 U.S.C. § 1677e(b) ("If [Commerce] finds that an
interested party has failed to cooperate by not acting to the
best of its ability to comply with a request for information
from [Commerce], [Commerce], in reaching the applicable
determination under this subtitle, may use an inference that is
adverse to the interests of that party in selecting from among
the facts otherwise available.  Such adverse inference may
include reliance on information derived from – (1) the petition,
(2) a final determination in the investigation under this
subtitle, (3) any previous review under section 1675 of this
title or determination under section 1675b of this title, or
(4) any other information placed on the record.").

[27] See Final Results of Redetermination Pursuant to Ct. Remand,
Ct. No. 11-00335, ECF No. 74, at 2 ("[B]ecause we have found
[the sole individually-examined respondent] to be part of the
PRC-wide entity, which is receiving [a rate based entirely on
adverse facts available], there are no calculated margins for
this period of review . . . and it is [therefore] unnecessary to
select a surrogate country in which to value a respondent's
factors of production . . . ."); id. at 24 ("[T]he PRC-wide rate
. . . represents a rate calculated in the petition in the
[original investigation into whether sales of subject
merchandise were being made at less than fair value] . . . .");
                                        (footnote continued)

reexamine the issue of surrogate country selection" in the fifth
review, and then subsequently continued to rely on the same
surrogate FOP values in examining Regal's fifth review pricing
as part of its revocation analysis.[28]  AHSTAC now challenges
Commerce's determination to continue to rely, without any
additional consideration or explanation, on surrogate FOP values
that were previously held to have been inadequate when
considered in light of other record evidence.[29]

In addition, AHSTAC challenges Commerce's
determination that "the continued application of the order is

_____

Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __,
925 F. Supp. 2d 1315 (2013) (affirming Commerce's determination
to rely on adverse facts available in re-calculating the
individually-investigated respondent's rate, but remanding the
rate for adequate corroboration); Ad Hoc Shrimp Trade Action
Comm. v. United States, __ CIT __, 992 F. Supp. 2d 1285 (2014)
(sustaining the agency's revisited corroboration of the PRC-wide
rate).

[28] Regal Post-Prelim. Mem., ECF Nos. 55 & 56 at Tab 7, at 3 ("The
[Court of International Trade] remanded the final results [of
the fifth review] to [Commerce] for further consideration
. . . .  However, pursuant to the [redetermination on remand],
[Commerce] ultimately was not required to respond to the
surrogate country issue in the remand as the question was
rendered moot after adverse facts available were applied to the
sole respondent.  As a result, [Commerce] did not perform an
antidumping calculation or reexamine the issue of surrogate
country selection.  Therefore, [Commerce], consistent with the
determination made in the AR5 Final Results, continues to find
India to be a reliable source for [surrogate FOP values for the
period covered by the fifth review] . . . .") (citation
omitted).

[29] See Pl.'s Br., ECF Nos. 41 & 42, at 13-22.

not otherwise necessary to offset dumping."[30]  Specifically,

AHSTAC argues that a discrepancy between the volume of entries

identified by U.S. importers as Regal's subject merchandise and

the volume of such shipments revealed in Regal's own data

reflects a "chronic concern with respect to Regal's subject

merchandise being incorrectly entered . . . throughout the

three-year revocation period."[31]  AHSTAC claims that this

---

[30] Regal Post-Prelim. Mem., ECF Nos. 55 & 56 at Tab 7, at 6
(applying 19 C.F.R. § 351.222(b)(2)(i)(C))(unchanged in the
AR7 Final Results, 78 Fed. Reg. at 56,210); see Pl.'s Br.,
ECF Nos. 41 & 42, at 22-35 (challenging this determination).

[31] Pl.'s Br., ECF Nos. 41 & 42, at 31.  This discrepancy was
first noted in the third administrative review of this order, in
which Commerce found that "certain importers improperly
classified [some of Regal's] subject entries as non-dutiable."
Issues & Decision Mem., Certain Frozen Warmwater Shrimp from the
People's Republic of China, A-570-893, ARP 07-08 (Aug. 28, 2009)
(adopted in 74 Fed. Reg. 46,565 (Dep't Commerce Sept. 10, 2009)
(final results and partial rescission of [third] antidumping
duty administrative review)) cmt. 7 at 23.  In the fourth
review, responding to a court-ordered remand to reexamine the
agency's reliance on importer-provided entry volume data to
select Regal for individual examination as one of the largest
exporters of subject merchandise by volume, see Ad Hoc Shrimp
Trade Action Comm. v. United States, __ CIT __, 791 F. Supp. 2d
1327, 1330-34 (2011), Commerce verified that no such discrepancy
of entry volumes existed during the period covered by that
review, see Ad Hoc Shrimp Trade Action Comm. v. United States,
__ CIT __, 828 F. Supp. 2d 1345, 1351 (2012).  The discrepancy
again appeared, however, during the sixth review, when Commerce
again found that Regal's reported U.S. sales quantity differed
from that reported by U.S. importers of Regal's subject
merchandise. See Issues & Decision Mem., Certain Frozen
Warmwater Shrimp from the People's Republic of China, A-570-893,
ARP 10-11 (Aug. 27, 2012) (adopted in AR6 Final Results, 77 Fed.
Reg. at 53,858) ("AR6 I&D Mem.") cmt. 7 at 36.  And while
                                        (footnote continued)

discrepancy is evidence indicating that the continued application of the order with respect to Regal remains necessary.[32]

Following a statement of the relevant standard of review, each challenge is addressed in turn.

## STANDARD OF REVIEW

The court upholds Commerce's antidumping determinations if they are in accordance with law and supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i).  Where, as here, the antidumping statute does not directly address the question before the agency, the court will defer to Commerce's construction of its authority if it is reasonable. Timken Co. v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (relying on Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938), and the substantial evidence standard of review "can be translated roughly to mean 'is [the

conceding that Commerce verified the accuracy of Regal's own sales data for the period covered by the seventh review, AHSTAC contends that the discrepancy continued into that period as well. Pl.'s Br., ECF Nos. 41 & 42, at 29.

[32] See Pl.'s Br., ECF Nos. 41 & 42, at 32-35.

determination] unreasonable?'" <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citation omitted, alteration in the original); <u>On-Line Careline, Inc. v. America Online, Inc.</u>, 229 F.3d 1080, 1085 (Fed. Cir. 2000) ("The substantial evidence standard requires the reviewing court to ask whether a reasonable person might find that the evidentiary record supports the agency's conclusion.") (citations omitted). Importantly, "[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." <u>Univ. Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951). Moreover, an agency acts arbitrarily, and therefore unreasonably, when it "entirely fail[s] to consider an important aspect of the problem" or "offer[s] an explanation for its decision that runs counter to the evidence before [it]." <u>Motor Vehicle Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).[33]

---

[33] Although the Court in <u>State Farm</u> was discussing the "arbitrary or capricious" (rather than the "substantial evidence") standard of review, this reasoning is also relevant here because an agency determination that is arbitrary is *ipso facto* unreasonable. <u>See, e.g.</u>, <u>Ward v. Sternes</u>, 334 F.3d 696, 704 (7th Cir. 2003) (noting that "a decision [that] is so inadequately supported by the record as to be arbitrary [is] therefore objectively unreasonable") (quotation marks and citations omitted).

**DISCUSSION**

I.   Commerce's Choice of Surrogate Factor of Production Values
     for the Fifth Review Period Is Not Supported by Substantial
     Evidence.

          First, AHSTAC challenges Commerce's decision – in

examining Regal's fifth review period sales to evaluate Regal's

revocation request – to continue to rely on the same surrogate

market economy data that were previously held to be inadequate

when read in light of the other record evidence.[34]  Specifically,

Commerce's choice of surrogate market economy values in the

fifth review was based on the agency's selection of India as the

primary surrogate market economy country for China.[35]  Because

Commerce's selection of an appropriate surrogate market economy

must be such that the chosen dataset provides the "best

available information" for approximating the NME producers'

experience,[36] Commerce chooses a primary surrogate country that

is economically comparable to the NME country[37] (measured in

terms of the countries' comparative per capita gross national

---

[34] Pl.'s Br., ECF Nos. 41 & 42, at 13-22.

[35] See AR5 I&D Mem. cmt. 2 at 10.

[36] See 19 U.S.C. § 1677b(c)(1); AR7 I&D Mem. cmt. 2 at 10
(emphasizing the importance of surrogate data's resemblance to
the NME producers' experience).

[37] 19 U.S.C. § 1677b(c)(4)(A).

income ("GNI")[38]), is a significant producer of comparable

merchandise,[39] and provides publicly-available, reliable, and

relevant data.[40]   In China Shrimp AR5, this Court held that

Commerce acted arbitrarily in the fifth review by disregarding

"the concern that India's per capita GNI was nearly a third of

China's [during the relevant time period], whereas Thailand's

per capita GNI was nearly identical thereto,"[41] despite the

record evidence that the quality of the available datasets from

these two potential surrogates was nearly indistinguishable.[42]

---

[38] Antidumping Methodologies in Proceedings Involving Non-Market
Economy Countries: Surrogate Country Selection and Separate
Rates, 72 Fed. Reg. 13,246, 13,247 (Dep't Commerce Mar. 21,
2007) ("Surrogate Country Selection Policy") (explaining that
"[Commerce] uses per capita income to measure [economic]
comparability").

[39] 19 U.S.C. § 1677b(c)(4)(B).

[40] See 19 U.S.C. § 1677b(c)(1); Import Admin., U.S. Dep't
Commerce, Non-Market Economy Surrogate Country Selection
Process, Policy Bulletin 04.1 (2004), available at
http://enforcement.trade.gov/policy/bull04-1.html (last visited
May 11, 2015) ("Commerce Policy 4.1") ("[D]ata quality is a
critical consideration affecting surrogate country selection.
After all, a country that perfectly meets the requirements of
economic comparability and significant producer is not of much
use as a primary surrogate if crucial factor price data from
that country are inadequate or unavailable.").

[41] China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1376.

[42] See id. at 1375 ("Commerce found that the Indian and Thai data
were so similar in quality that Commerce was unable to make a
distinction between the two countries based on the datasets'
specificity to the input in question, exclusivity of taxes and
import duties, contemporaneity with the period of investigation
                                         (footnote continued)

Defendant argues that, in revisiting the issue in the context of Regal's revocation request, Commerce recognized "that the Court had previously remanded Commerce's fifth review primary surrogate country selection," and that Commerce therefore "reconsidered its surrogate country selection for the limited purpose of evaluating Regal's revocation request."[43]  But in fact the agency itself explicitly states that Commerce did *not* reconsider this matter.  Specifically, Commerce explained that because it "ultimately was not required to respond to the surrogate country issue," Commerce *"did not . . . reexamine the issue of surrogate country selection"* and *"[t]herefore . . . continues to find India to be a reliable source for [surrogate values* for the calculation of normal value for the period covered by the fifth review]."[44]  Disregarding the court's holding in <u>China Shrimp AR5</u>, Commerce did not consider or weigh

---

[43] Def.'s Resp. in Opp'n to Pl.'s Mot. for J. Upon the Agency R., ECF Nos. 53 (conf. version) & 54 (pub. version) ("Def.'s Br.") at 11 (citing <u>AR7 I&D Mem.</u> cmt. 2 at 7-10; <u>Regal Post-Prelim. Mem.</u>, ECF Nos. 55 & 56 at Tab 7, at 2-3).

[44] <u>Regal Post-Prelim. Mem.</u>, ECF Nos. 55 & 56 at Tab 7, at 3 (emphasis added) (unchanged in <u>AR7 I&D Mem.</u> cmt. 2 at 7 (relying on and citing explanation contained in <u>Regal Post-Prelim. Mem.</u>, ECF Nos. 55 & 56 at Tab 7, at 3)); <u>see also</u> <u>AR7 I&D Mem.</u> cmt. 2 at 9-10 (relying on the agency's original analysis in the fifth review, without any indication of reconsideration).

or review, or public availability – i.e., based on its usual data-evaluation standards.") (citing <u>AR5 I&D Mem.</u> cmt. 2 at 7).

the effect of the significant divergence between India and
Thailand's respective economic comparability to China when
determining, based on reasoning reiterated from the fifth
review, that while the record provided adequate surrogate FOP
datasets from both potential surrogates, the Indian dataset
provided the best available information.[45]

---

[45] Compare AR7 I&D Mem. cmt. 2 at 9 ("[Commerce] does not believe
that the [antidumping statute] requires it to compare relative
GNI of the [potential surrogate] countries in its analysis.");
id. at 7 ("[Commerce] continue[s] to regard both Thailand and
India as being at the *same* level of economic development as the
PRC.") (emphasis added), and AR5 I&D Mem. cmt. 2 at 6-7 (relied
on in AR7 I&D Mem. cmt. 2 at 7) ("[When selecting surrogate
market economy countries for the normal value calculation in NME
cases, Commerce] creates a list of possible surrogate countries
that are to be *treated as equally comparable* in evaluating their
suitability for use as a surrogate country[, regardless of any
differences among the potential surrogates in terms of their
relative GNI proximity to the per capita GNI of the NME country]
. . . . [C]onsistent with [this policy], [Commerce] continues
to find that [India and Thailand] are *equally* economically
comparable to the PRC for purposes of [surrogate value]
calculations.") (emphasis added), with China Shrimp AR5,
__ CIT at __, 882 F. Supp. 2d at 1375 ("An unexplained and
conclusory blanket policy of simply ignoring relative GNI
comparability within a particular range of GNI values does not
amount to a reasonable reading of the evidence in support of a
surrogate selection where more than one potential surrogate
within that GNI range is a substantial producer of comparable
merchandise for which adequate data is publicly available.
Rather, in such situations, Commerce must explain why its chosen
surrogate's superiority in one of the three eligibility criteria
outweighs another potential surrogate's superiority in one or
more of the remaining criteria.") (citing Amanda Foods (Vietnam)
Ltd. v. United States, 33 CIT 1407, 1413, 647 F. Supp. 2d 1368,
1376 (2009)); id. at 1376 ("Contrary to the Government's
assertions, . . . this record is not so clear as to lead to the
conclusion that [the] difference in data quality [between the
                                        (footnote continued)

Defendant emphasizes Commerce's position that "[w]ithin a given [GNI] range, differences in per capita GNI between the countries do not imply any difference in level of economic development,"[46] and argues that "given that minor GNI differences do not correlate to differences in countries' levels of economic development, Commerce's methodology of considering data quality in choosing among the countries that are at a comparable level of economic development and significant producers of subject merchandise is reasonable."[47]  But this argument ignores this Court's repeated holdings that where, as here, adequate data is available from more than one country that is both at a level of economic development comparable to the NME and a significant producer of comparable merchandise, Commerce must weigh the relative merits of such potential surrogates' datasets in a way that does not arbitrarily discount the accuracy-enhancing value of sourcing surrogate data from a market economy whose economic development is as close as possible to that of the NME, and in that regard may provide the

---

Indian and Thai surrogate value datasets] necessarily outweighed the concern that India's per capita GNI was nearly a third of China's, whereas Thailand's per capita GNI was nearly identical thereto.") (quotation marks and citation omitted).

[46] AR7 I&D Mem. cmt. 2 at 8; see Def.'s Br., ECF Nos. 53 & 54, at 15-16.

[47] Def.'s Br., ECF Nos. 53 & 54, at 16 (footnote omitted).

"best available information."[48]

       Here, the record of the fifth review, like that of the

_____

[48] See 19 U.S.C. § 1677b(c)(1); China Shrimp AR5, __ CIT at __,
882 F. Supp. 2d at 1375-76; Amanda Foods, 33 CIT at 1413, 647
F. Supp. 2d at 1376; Viet Hoan Corp. v. United States,
__ CIT __, 49 F. Supp. 3d 1285, 1302-06 (2015).  Although
Commerce cites to Fujian Lianfu Forestry Co. v. United States,
33 CIT 1056, 638 F. Supp. 2d 1325 (2009), for the broad
proposition that the agency may select India as the primary
surrogate for China "even though there were other economically-
comparable countries with GNIs closer to the GNI of China,"
AR7 I&D Mem. cmt. 2 at 8 & n.36, the record in that case (unlike
the record here, or in Viet Hoan, for example) revealed that
Commerce's surrogate country selection was based on significant
and substantial differences between the alternative datasets.
Compare China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1375-
76, and Viet Hoan, __ CIT at __, 49 F. Supp. 3d at 1304 (each
discussing the unusual level of scrutiny Commerce resorted to in
those cases to distinguish between multiple suitable datasets),
with Fujian, 33 CIT at 1079-80, 638 F. Supp. 2d at 1350-51
& n.11 (explaining Commerce's findings in that case that the
"Indian data provided [significantly] more comprehensive
coverage of, and were more specific to, the inputs used in the
production [of the subject merchandise]"; noting that no
alternative data was available for several important inputs; and
emphasizing that the plaintiff in that case did not "contest
Commerce's finding that Indian data provide[d] greater coverage
than Philippine data for valuing inputs specific to the
production [of the subject merchandise]" or "Commerce's finding
that Indian data provided more specific input values").  Thus
the question of whether it is reasonable for Commerce to ignore
relative economic comparability when evaluating datasets of
otherwise similar quality was not before the court in Fujian.
See Fujian, 33 CIT at 1075-80, 638 F. Supp. 2d at 1347-51
(rejecting the plaintiff's argument that India's per capita GNI
differed so greatly from China's that it should not have been a
surrogate candidate at all; noting that the plaintiff had
conceded the clear superiority of the Indian data in terms of
its specificity and comprehensiveness; and not addressing the
issue of how to distinguish between datasets of very similar
quality).

AD proceeding at issue in <u>Viet Hoan</u>,[49] clearly reveals the basis

for the court's concern.  During the fifth review, Commerce

found that both India and Thailand fell within a range of GNI

values comparable to the per capita GNI of China, that both of

these potential surrogates were significant producers of

comparable merchandise, and that "[t]here exist[ed] on the

record sufficient, publicly available surrogate factor

information for the majority of FOPs from both India and

Thailand" that was "of roughly equal specificity," and that

otherwise satisfied the agency's usual data-quality standards.[50]

But in deciding which of these two datasets would provide the

"best available" information, Commerce (both in the original

fifth review and in examining Regal's fifth review pricing as

part of its revocation analysis) categorically and formulaically

disregarded the evidence that the Indian data came from a

country whose per capita GNI was barely a third of China's,

whereas the Thai data was from an economy whose per capita GNI

---

[49] <u>See Viet Hoan</u>, __ CIT at __, 49 F. Supp. 3d at 1304-05 (noting
that "Commerce indicated the unusual level of scrutiny it would
need to apply to distinguish between otherwise usable data sets"
but nevertheless denied that "weighing the relative GNIs of the
countries [may] improve [its] selection of the best available
information").

[50] <u>AR5 I&D Mem.</u> cmt. 2 at 7.

was virtually identical to China's.[51]

　　　　Commerce's refusal to account for the accuracy-enhancing value of relative GNI proximity when evaluating the relative merits of alternative satisfactory datasets, to determine which set constitutes the best available surrogate value information, is arbitrary and, therefore, unreasonable.[52] Commerce's own comparability metric implies that, all other considerations being roughly equal, surrogate data from a country whose GNI is nearly *identical* to that of the NME would be more likely to better approximate the values that would prevail within the NME itself, if the latter were a market economy, than would data from a country whose per capita GNI diverges from that of the NME by multiple orders of magnitude.[53]

---

[51] See AR7 I&D Mem. cmt. 2 at 8 (reproducing the GNI data, showing that during the relevant time period, "the PRC had a GNI of $2,940, India had a GNI of $1,070 . . . [and] Thailand had a GNI of $2,840") (citation omitted).  The accuracy of these GNI values is not in dispute.

[52] China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1375-76; Amanda Foods, 33 CIT at 1413, 647 F. Supp. 2d at 1376; Viet Hoan, __ CIT at __, 49 F. Supp. 3d at 1302-06.

[53] See Surrogate Country Selection Policy, 72 Fed. Reg. at 13,247 (noting that "the closest country to [an NME]'s level of economic development" is the country whose per capita GNI most closely approximates that of the NME); id. (implying a spectrum of economic comparability by stating that Commerce is not obligated to choose the "country [that] is the most economically comparable to the NME" when "us[ing] per capita income to measure comparability").  Here, the very existence of this

                                              (footnote continued)

Commerce maintains, as it did in China Shrimp AR5, that significant "differences of quality of data sources" adequately support the agency's selection of Indian rather than Thai surrogate values to determine the normal comparison values in the fifth review, notwithstanding the Thai economy's far greater comparability to that of China.[54] Specifically, Commerce relies on its reasoning from the fifth review that "the data from India were superior to that from Thailand [because,] of the ten FOPs, three had a more specific Indian [Harmonized Tariff Schedule ('HTS')] number while seven had equally specific Indian and Thai HTS numbers," and because the Indian financial statement on record was from a producer that, like Regal, was "a shrimp farmer as well as shrimp processor."[55]   But by Commerce's

---

dispute implies a meaningful difference in the outcome of the normal value calculation, depending on whether the Thai or the Indian surrogate values are used, and it is unreasonable for Commerce to imply that this difference (which is at least partially due to the GNI disparity between the two countries from which the competing data is sourced) has no bearing on the relative accuracy of the resulting normal value calculations, or on the question of which dataset constitutes the best available information for this purpose.

[54] See AR7 I&D Mem. cmt. 2 at 10; China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1375-76.

[55] AR7 I&D Mem. cmt. 2 at 10 (relying on AR5 I&D Mem. cmt. 2 at 7, 10); see AR5 I&D Mem. cmt. 2 at 10 ("[B]ecause the Indian shrimp larvae [i.e., the critical input used by the sole individually-investigated ('mandatory') respondent in the fifth review] [surrogate value] source fulfills more of [Commerce]'s
                                        (footnote continued)

usual data evaluation standards, the record contained adequate

and suitable data from both India and Thailand, because Commerce

was unable to make a distinction between the two countries based

on the datasets' specificity to the input in question,

exclusivity of taxes and import duties, contemporaneity with the

period of review, or public availability.[56]

Thus, to differentiate between the two satisfactory

datasets, Commerce focused on minute, seemingly hair-splitting

differences.  Because the Indian and Thai data generally were of

such similar quality that Commerce was unable to distinguish

them using its usual standards, the agency compared Indian and

Thai information for valuing shrimp larvae, the critical input

used by the mandatory respondent in the fifth review to produce

---

[surrogate value] selection criteria, and the Indian surrogate
company, Falcon Marine, is more reliable than the surrogate
financial data from Thailand [due to the absence of convincing
evidence that the Thai company, Seafresh, is an integrated
producer that farms as well as processes shrimp], we will
continue to use India as the primary surrogate country for the
valuation of FOPs and surrogate financial ratios.").

[56] China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1375
(citing AR5 I&D Mem. cmt. 2 at 7); see Commerce Policy Bulletin
04.1 ("In assessing [the quality and suitability of surrogate
value data in NME cases], it is [Commerce]'s stated practice to
use investigation or review period-wide price averages, prices
specific to the input in question, prices that are net of taxes
and import duties, prices that are contemporaneous with the
period of investigation or review, and publicly available
data.").

the subject merchandise.  Here again Commerce found that the

Indian and Thai information for valuing shrimp larvae was of

very similar quality, but the Thai data were specific to black

tiger shrimp, whereas the Indian data did not specify a species.

Based on this distinction, Commerce concluded that because the

sole mandatory respondent neither produced nor sold black tiger

shrimp, the Indian shrimp larvae data were superior (because,

unlike the Thai data, they did not specify the species of shrimp

to which they pertained).[57]  But unlike the sole mandatory

respondent in the fifth review, Regal did not use shrimp larvae

to produce the subject merchandise,[58] so the relative quality of

Indian and Thai larvae data is not relevant.  As AHSTAC points

---

[57] China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1375-76
(quotation and alteration marks omitted) (citing AR5 I&D Mem.
cmt. 2 at 8).

[58] Pl. [AHSTAC]'s [Conf. & Pub.] Reply Mem. in Supp. of USCIT
Rule 56.2 Mot. for J. on the Agency R., ECF Nos. 57 (conf.
version) & 58 (pub. version) ("Pl.'s Reply") at 8 (relying on
[Commerce's] Surrogate Factor Valuations for the [Seventh Admin.
Review] Post-Prelim. Analysis for Regal in [the Fifth Review],
Certain Frozen Warmwater Shrimp from the People's Republic of
China, A-570-893, ARP 11-12 (May 20, 2013), reproduced in [Conf.
& Pub.] App. to Mem. in Supp. of Pl.'s Reply Mem. in Supp. of
its USCIT Rule 56.2 Mot. for J. on the Agency R., ECF Nos. 59
(conf. version) & 60 (pub. version) ("Pl.'s Reply App.")
at Tab 3 ("Regal AR5 SV Mem.") at 3-4, Ex. 1). See Regal AR5 SV
Mem., ECF Nos. 59 & 60 at Tab 3, at 3 (noting that "[b]roodstock
was not a reported [surrogate value] in the original [fifth]
review" and concluding that Global Trade Atlas data from
Thailand "is clearly an exact match to the FOP used by Regal
during the [period of review]").

out, Regal used a different set of FOPs from those used by the
respondent in the original fifth review and, unlike that
respondent, Regal used broodstock rather than shrimp larvae as
its critical input for producing the subject merchandise.[59]   And
as Commerce itself concluded, the better surrogate value data
for Regal's broodstock came from Thailand, not India.[60]

        Thus Commerce's reasoning that its original analysis
in the fifth review supports its conclusion here that the Indian
data is superior to the Thai data because the former more
closely matches Regal's own FOPs and production process[61] is not
supported by a reasonable reading of the evidence.   Not only is
this reasoning belied by Commerce's own finding in the original
fifth review that the Indian and Thai data were of "roughly
equal specificity," this reasoning is moreover no longer
applicable, because Regal's FOPs are substantially different
from those originally considered by Commerce in the fifth
review, and particularly because the key factor of production on

---

[59] Pl.'s Reply, ECF Nos. 57 & 58, at 7-8 (relying on Regal AR5
SV Mem., ECF Nos,. 59 & 60 at Tab 3, at 3-4, Ex. 1).

[60] Regal AR5 SV Mem., ECF Nos. 59 & 60 at Tab 3, at 3.   Commerce
also selected Thailand as the primary surrogate country for the
sixth and seventh reviews. See Def.'s Br., ECF Nos. 53 & 54,
at 17-18; Pl.'s Br., ECF Nos. 41 & 42, at 15.

[61] AR7 I&D Mem. cmt. 2 at 10 (relying on AR5 I&D Mem. cmt. 2
at 7, 10).

which Commerce based its data-evaluation in the original fifth review (shrimp larvae) was not used by Regal at all.

Commerce's alternative reasoning – that the Indian data provided the best available surrogate information for Regal's fifth review normal value calculation because the Indian financial statement on record more closely approximated Regal's experience[62] – is also not supported by substantial evidence. This is because Commerce did not account for or in any way address the additional evidence submitted by AHSTAC in support of its argument that the Thai financial statement on the record is from a company that, like the Indian company, and like Regal, is also an integrated producer (i.e., a shrimp farmer as well as shrimp processor).[63] Specifically, Commerce reasoned in the original fifth review that the evidence was insufficient to conclude that the Thai company was an integrated producer,

---

[62] Id. at 10 & n.42.

[63] See AR7 I&D Mem. cmt. 2 at 10 (relying on AR5 I&D Mem. cmt. 2 at 10); AR5 I&D Mem. cmt. 2 at 9-10 (concluding that the Indian company's financial statement on record more closely approximated the NME respondent's experience than the Thai company's financial statement because, like the respondent in that review, the Indian company was "a shrimp farmer as well as shrimp processor," whereas the Thai company's financial statement provided no "indication that [the company] farms and processes shrimp") (citation omitted); AR7 I&D Mem. cmt. 2 at 10 n.42 (noting that Regal, like the respondent in the original fifth review, uses an integrated production process that both farms and processes shrimp).

because the certification submitted by AHSTAC in support of this
claim did not clearly indicate that it applied to this specific
company.[64]  But in this revocation proceeding, AHSTAC submitted
additional evidence in support of its claim that this specific
Thai company was indeed certified as a hatchery, farm, and
processing plant.[65]  Commerce completely ignored this evidence,
instead relying entirely on its original fifth review analysis.[66]

But most importantly, Commerce completely (and
categorically) ignored the *biggest* difference in quality between
the two datasets, which is that the Thai data was from a market
economy that very nearly mirrored China's level of economic
development (by Commerce's own metric, which "uses per capita

---

[64] See AR5 I&D Mem. cmt. 2 at 9-10 (explaining that AHSTAC
submitted evidence from "an organization that certifies shrimp
hatcheries, farms, feed mills, and processing plants for 'Best
Aquaculture Practices,'" which listed the Thai company within a
set of companies receiving a group certification, but concluding
that "[e]ven if [Commerce] were to assume that these facilities
were somehow related," it was unable to conclude that the Thai
company was an integrated producer because this evidence
concerned the "Seafresh Industry Group – Thailand, [whereas] the
financial statement on the record of this proceeding is
specifically for Seafresh Industry Public Company Ltd., not
Seafresh Industry Group – Thailand").

[65] Pl.'s Reply, ECF Nos. 57 & 58, at 10 (citing [AHSTAC's] Data
on Surrogate Values for the Fifth Admin. Review (2009-2010),
Certain Frozen Warmwater Shrimp from the People's Republic of
China, A-570-893, ARP 11-12 (Feb. 4, 2013), reproduced in Pl.'s
Reply App., ECF Nos. 59 & 60 at Tab 5, at 7, Ex. 6(b)).

[66] See AR7 I&D Mem. cmt. 2 at 10 (relying on AR5 I&D Mem. cmt. 2
at 10).

income to measure [countries' economic] comparability"[67]),

whereas the Indian data reflected values present in an economy

whose per capita GNI was multiple orders of magnitude lower than

China's.  In doing so, Commerce arbitrarily ignored an important

aspect of the issue.[68]

Accordingly, the agency's reliance in this revocation

proceeding upon its original fifth review analysis of surrogate

dataset alternatives is not supported by substantial evidence,

and must therefore be remanded for reconsideration.

## II.  Regal's Import Volume Discrepancy

AHSTAC additionally challenges Commerce's

---

[67] Surrogate Country Selection Policy, 72 Fed. Reg. at 13,247;
see also id. (noting that "the closest country to [an NME]'s
level of economic development" is the country whose per capita
GNI most closely approximates that of the NME).

[68] China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1375-76;
see also Vinh Hoan, __ CIT at __, 49 F. Supp. 3d at 1305 ("[T]he
ultimate question is what is the best available information to
value [an NME respondent's] factors of production?  Thus,
Commerce must choose the [primary surrogate] country that
furthers this goal.  The analysis suggested by [China Shrimp
AR5], and adopted here, is that Commerce must compare
differences in economic comparability with differences in the
other factors, including data quality, when the facts so
require."); id. at 1304 (explaining that the record of that
case, like that of China Shrimp AR5, required comparison of
potential surrogates' relative economic comparability to the NME
country, because the record revealed that multiple countries'
datasets satisfied the agency's threshold suitability criteria
and, like in China Shrimp AR5, Commerce was therefore compelled
to resort to an "unusual level of scrutiny . . . to distinguish
between otherwise usable data sets").

determination that "the continued application of the order [as

to Regal] is not otherwise necessary to offset dumping,"[69]

claiming that a discrepancy between the volume of entries

identified by Regal's U.S. importers as merchandise subject to

the AD order and the volume of such shipments revealed in

Regal's own data indicates that the continued application of the

order with respect to Regal remains necessary.[70]  But as Commerce

explains, the agency conducted an on-site verification of Regal

as part of this revocation proceeding, during which Commerce

reviewed and analyzed Regal's sales data for the periods covered

by the fifth, sixth, and seventh reviews.[71]  Commerce "completed

[quantity and value] reconciliations and completeness tests for

[those periods]," found no discrepancies, and therefore

concluded that "there is no basis to find that Regal's reported

data is inaccurate."[72]  AHSTAC concedes that Commerce verified

---

[69] Regal Post-Prelim. Mem., ECF Nos. 55 & 56 at Tab 7, at 6
(applying 19 C.F.R. § 351.222(b)(2)(i)(C))(unchanged in the
AR7 Final Results, 78 Fed. Reg. at 56,210); Pl.'s Br.,
ECF Nos. 41 & 42, at 22-35.

[70] See Pl.'s Br., ECF Nos. 41 & 42, at 32-35.

[71] AR7 I&D Mem. cmt. 6 at 14.

[72] Id.; see Verification of the Sales and Factors Responses of
[Regal], Certain Frozen Warmwater Shrimp from the People's
Republic of China, A-570-893, ARP 11-12 (June 21, 2013),
reproduced in Def.'s App, ECF Nos. 55 & 56 at Tab 8
(pub. version) & ECF No. 55 at Tab 15 (conf. version).

the accuracy of Regal's sales data, and does not challenge that finding.[73]

Thus, consistent with Commerce's prior findings in this regard,[74] to the extent that the record reveals a discrepancy between the volume of subject merchandise exported by Regal and that reported as such by U.S. importers, the inaccuracies are in the information submitted to U.S. Customs and Border Protection ("Customs") by the importers, not in the data used by Commerce to determine that Regal did not export to the United States at dumped prices during the relevant time periods.  Because Commerce is concerned solely with the latter inquiry, and because the agency adequately verified that the necessary data for that determination was accurate, Commerce reasonably concluded that this discrepancy did not affect the accuracy of Regal's verified sales information, upon which Commerce based its determination that the continued application

---

[73] See Pl.'s Br., ECF Nos. 41 & 42, at 29.

[74] See AR6 I&D Mem. cmt. 7 at 38 ("Regal has cooperated with [Commerce] and provided all requested information by the applicable deadlines[,] . . . [and] no record evidence demonstrates that Regal attempted to misclassify entries of subject merchandise.  Moreover, there is no information on the record that indicates Regal underreported its U.S. sales information.") (citation omitted); *supra* note 31 (detailing relevant history).

of the order as to Regal was not necessary to offset dumping.[75]
Because Regal's own information was verified as accurate, the
discrepancy in reported import volume has no bearing on the
accuracy of the dumping determination, and is a matter that is
more appropriately addressed to Customs' enforcement authority.[76]

      Accordingly, Commerce's determination that any
discrepancy between Regal's verified sales data and entry data
reported by U.S. importers to Customs does not impugn the
accuracy of Commerce's dumping determinations, or its consequent
determination that the continued application of the order as to
Regal is not necessary to offset dumping, is sustained.

---

[75] See AR7 I&D Mem. cmt. 6 at 14.

[76] See Def.'s Br., ECF Nos. 53 & 54, at 31 ("Commerce verified
the data submitted by Regal, ensured there were no
discrepancies, and calculated a dumping margin based on the
verified information that supported Regal's revocation request.
. . .  To the extent [AHSTAC] wishes to pursue claims regarding
importer misclassification, Commerce previously has explained
that it generally refers such matters to [Customs].") (quoting
AR6 I&D Mem. cmt. 7 at 38 ("[Customs] is the U.S. government
authority responsible for determining whether the importer has
properly classified merchandise as subject or non-subject at
time of entry.") (citation omitted); AR5 I&D Mem. cmt. 1 at 4
("[C]omplaints of deliberate misclassification of entries or
fraudulent activity regarding entries into the United States
should be properly lodged with [Customs].") (citing Globe
Metallurgical Inc. v. United States, __ CIT __, 722 F. Supp. 2d
1372, 1381 (2010))); Globe Metallurgical, __ CIT at __, 722 F.
Supp. 2d at 1381 (noting that "Commerce's recognition of
[Customs]'s authority to investigate fraud, gross negligence, or
negligence involving entries of merchandise" is consistent with
19 U.S.C. § 1592).

## CONCLUSION

For all of the foregoing reasons, Commerce's company-specific revocation of this antidumping duty order as to Regal is remanded solely for reconsideration of the surrogate data used to determine normal value for Regal's price comparisons during the period covered by the fifth administrative review. Commerce shall have until July 17, 2015, to complete and file its remand results.  Plaintiff shall have until July 31, 2015, to file its comments, and the agency shall then have until August 10, 2015, to respond.

It is SO ORDERED.


                                    /s/ Donald C. Pogue
                              Donald C. Pogue, Senior Judge


Dated: June 5, 2015
       New York, NY