Slip Op. 16 - 7

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>UNITED STATES,<br><br>　　　　　Defendant. | Before: Donald C. Pogue,<br>　　　　　Senior Judge<br><br>Court No. 13-00346 |

<u>OPINION</u>

[affirming the Department of Commerce's redetermination on remand]

Dated: January 21, 2016

<u>Andrew W. Kentz</u>, <u>Jordan C. Kahn</u>, and <u>Roop K. Bhatti</u>, Picard Kentz & Rowe LLP, of Washington, DC, for the Plaintiff.

<u>Joshua E. Kurland</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant.  Also on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant Director.  Of counsel on the brief was <u>Melissa M. Brewer</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

**Pogue, Senior Judge:**  This action arises from the

seventh administrative review by the U.S. Department of Commerce

("Commerce") of the antidumping duty order ("the order") on

certain frozen warmwater shrimp from the People's Republic of

China ("PRC" or "China").[1]  In this seventh review, Commerce

determined to revoke the order with respect to respondent

Zhanjiang Regal Integrated Marine Resources Company, Limited

("Regal").[2]

          Adjudicating appeals from Plaintiff Ad Hoc Shrimp

Trade Action Committee ("AHSTAC") – an association of domestic

warmwater shrimp producers that participated in this seventh

review[3] – this Court remanded Commerce's determination to revoke

the order as to Regal, ordering the agency to reconsider certain

surrogate value data used to determine Regal's normal value.[4]

The agency's Remand Results are now before the court.[5]

          The parties now raise two issues.  First, Commerce

protests an aspect of the court's holding in ordering remand in

---

[1] See Certain Frozen Warmwater Shrimp from the [PRC], 78 Fed.
Reg. 56,209 (Dep't Commerce Sept. 12, 2013) (final results of
administrative review; 2011-2012) ("AR7 Final Results") and
accompanying Issues & Decision Mem., A-570-893, ARP 11-12
(Sept. 12, 2013) ("AR7 I&D Mem.").

[2] AR7 Final Results, 78 Fed. Reg. at 56,209-10.

[3] See Compl., ECF No. 2, at ¶ 7.

[4] Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __,
70 F. Supp. 3d 1328 (2015) ("AHSTAC I").  While relevant
background is summarized below, familiarity with AHSTAC I is
presumed.

[5] Final Results of Redetermination Pursuant to Ct. Remand,
ECF No. 65 ("Remand Results").

AHSTAC I.[6]  Second, AHSTAC challenges Commerce's selection, in

the Remand Results, of a certain surrogate value for one of the

factors of production used to construct Regal's normal value.[7]

        The court has jurisdiction pursuant to

Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as

amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[8] and 28 U.S.C.

§ 1581(c) (2012).

        As explained below, Commerce's redeterminations on

remand are supported by a reasonable reading of the record

evidence, and are therefore sustained.

BACKGROUND

        Antidumping duty orders are imposed on imported

merchandise that is sold at prices below normal value (i.e.,

"dumped").[9]  "[N]ormal value" is usually the price at which a

foreign producer's like products are sold in the exporting

country or, for merchandise originating in non-market economies

("NMEs"), a value calculated using appropriate surrogate market

---

[6] Id. at 1, 7.

[7] Pl. [AHSTAC]'s Comments on Final Results of Redetermination
Pursuant to Ct. Order, ECF No. 70 ("Pl.'s Br.").

[8] Further citations to the Tariff Act of 1930, as amended, are to
the relevant provisions of Title 19 of the U.S. Code,
2012 edition.

[9] See 19 U.S.C. §§ 1673; 1677(34); 1677(35)(A); 1677b.

economy data.[10]  Such orders are regularly administratively

reviewed by Commerce, such that the agency determines

producer/exporter-specific dumping margins, covering discrete

(typically one-year) time periods, by making contemporaneous

normal value to export price comparisons.[11]  Pursuant to a

regulation in effect at the time of the administrative review at

issue here, Commerce was authorized to revoke the order with

respect to particular exporters/producers if Commerce found,

*inter alia*, that such an exporter/producer had not "sold the

merchandise at . . . less than normal value for a period of at

least three consecutive years."[12]  Here, Regal requested company-

specific revocation pursuant to this regulation.[13]

By the time of Commerce's decision regarding Regal's

request, Regal had been individually examined in the sixth and

---

[10] See id. at §§ 1677b(a)(1)(B)(i), 1677b(c).

[11] See id. at § 1675(a).

[12] 19 C.F.R. § 351.222(b)(2)(i)(A) (2012). This regulatory
provision was subsequently revoked for administrative reviews
initiated on or after June 20, 2012. Modification to Regulation
Concerning the Revocation of Antidumping and Countervailing Duty
Orders, 77 Fed. Reg. 29,875, 29,876 (Dep't Commerce
May 21, 2012).  As the review at issue here was initiated on
April 30, 2012, the regulation was still in effect.
See Initiation of Antidumping and Countervailing Duty
Administrative Reviews and Request for Revocation in Part,
77 Fed. Reg. 25,401, 25,403 (Dep't Commerce Apr. 30, 2012).

[13] See AR7 I&D Mem., *supra* note 1, cmt. 2 at 6.

seventh reviews, and received zero percent dumping margins in

both proceedings.[14]  Regal was not, however, individually

examined in the fifth review;[15] rather, it was assigned a zero

---

[14] Where it is not practicable to make individual weighted
average dumping margin determinations for each known exporter
and producer of the subject merchandise for whom review was
requested, Commerce may limit its individualized examination to
a smaller number of companies, 19 U.S.C. § 1677f-1(c)(2), and
assign to the remaining respondents the "all-others" rate
(calculated in accordance with 19 U.S.C. § 1673d(c)(5)) or,
where appropriate, the NME countrywide rate.
See Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,
__ CIT __, 28 F. Supp. 3d 1317, 1339-40 n.107 (2014).  Regal was
individually examined in the sixth and seventh administrative
reviews of this order. Certain Frozen Warmwater Shrimp from the
[PRC], 77 Fed. Reg. 12,801, 12,801 (Dep't Commerce Mar. 2, 2012)
(preliminary results, partial rescission, extension of time
limits for the final results, and intent to revoke, in part, of
the sixth antidumping duty administrative review) (explaining
that Commerce selected Regal for individual examination in the
sixth review) (unchanged in 77 Fed. Reg. 53,856 (Dep't Commerce
Sept. 4, 2012) (final results, partial rescission of sixth
antidumping duty administrative review and determination not to
revoke in part) and accompanying Issues & Decision Mem., A-570-
893, ARP 10-11 (Aug. 27, 2012) ("AR6 I&D Mem.")); Decision Mem.
for Prelim. Results, Partial Rescission of Antidumping Duty
Admin. Review, Certain Frozen Warmwater Shrimp from the [PRC],
A-570-893, ARP 11-12 (Mar. 12, 2013) ("AR7 Prelim. Decision
Mem.") at 3 (explaining that Commerce selected Regal for
individual examination in the seventh review) (adopted in
78 Fed. Reg. 15,696, 15,696 n.1 (Dep't Commerce Mar. 12, 2013)
(preliminary results of administrative review; 2011-2012)
(unchanged in AR7 Final Results, 78 Fed. Reg. 56,209)).

[15] Certain Frozen Warmwater Shrimp from the [PRC], 76 Fed. Reg.
8338, 8341 (Dep't Commerce Feb. 14, 2011) (preliminary results
and preliminary partial rescission of fifth antidumping duty
administrative review) (explaining that Commerce selected only
one company for individual examination in the fifth review,
which was not Regal) (unchanged in 76 Fed. Reg. 51,940 (Dep't
Commerce Aug. 19, 2011) (final results and partial rescission of
                                        (footnote continued)

percent dumping margin based on its individually-calculated zero percent rate in the previous (fourth) review.[16]  Because Regal was not individually examined in the fifth review, Commerce, in the seventh review, requested from Regal information and sales data from the time period covered by that fifth review,[17] "to confirm that Regal did not dump [subject merchandise] during that time,"[18] and hence to confirm that Regal did not dump for three consecutive years, as required for revocation eligibility under the regulation.[19]

Because Commerce considers China to be a non-market economy, the agency generally calculates normal value for China-originating merchandise using "the value of the factors of production utilized in producing the merchandise," including "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses" (collectively, the "FOPs"), from a surrogate market economy country.[20]

---

[fifth] antidumping duty administrative review) ("AR5 Final Results")).

[16] See AR5 Final Results, 76 Fed. Reg. at 51,942.

[17] The period of review for that proceeding was February 1, 2009, through January 31, 2010. Id. at 51,940.

[18] AR7 I&D Mem., *supra* note 1, cmt. 2 at 6.

[19] See 19 C.F.R. § 351.222(b)(2)(i)(A).

[20] See 19 U.S.C. § 1677b(c)(1); [Commerce's] Post-Prelim.
                                                   (footnote continued)

As this Court explained in <u>AHSTAC I</u>:

> Because Commerce's selection of an appropriate
> surrogate market economy must be such that the chosen
> dataset provides the best available information for
> approximating the NME producers' experience, Commerce
> chooses a primary surrogate country that is
> economically comparable to the NME country (measured
> in terms of the countries' comparative per capita
> gross national income ('GNI')), is a significant
> producer of comparable merchandise, and provides
> publicly-available, reliable, and relevant data.[21]

Commerce originally chose India as the appropriate

surrogate market economy country for China during the period

covered by the fifth review.[22]  Although AHSTAC successfully

---

Analysis for [Regal] and [Another Resp't], <u>Certain Frozen
Warmwater Shrimp from the [PRC]</u>, A-570-893, ARP 11-12 (May 20,
2013), <u>reproduced in</u> App. to Def.'s Resp. in Opp'n to Pl.'s Mot.
for J. Upon the Agency R., ECF Nos. 55 (conf. version) & 56
(pub. version) at Tab 7 ("<u>Regal Post-Prelim. Mem.</u>") at 3
(unchanged in the <u>AR7 Final Results</u>, 78 Fed. Reg. at 56,210).
Although the statute permits Commerce to source its data from
multiple surrogate market economies, <u>see</u> 19 U.S.C.
§ 1677b(c)(1), Commerce normally values all factors of
production using reliable data from a single surrogate market
economy country, if possible, <u>see</u> 19 C.F.R. § 351.408(c)(2);
<u>Clearon Corp. v. United States</u>, Slip Op. 13-22, 2013 WL 646390,
at *6 (CIT Feb. 20, 2013) (noting that Commerce's regulatory
"preference for the use of a single surrogate country" is
reasonable because, "as Commerce points out, deriving the
surrogate data from one surrogate country limits the amount of
distortion introduced into its calculations") (quotation marks
and citation omitted).

[21] <u>AHSTAC I</u>, __ CIT at __, 70 F. Supp. 3d at 1336 (quotation
marks and citations omitted).

[22] Issues & Decision Mem., <u>Certain Frozen Warmwater Shrimp from
the [PRC]</u>, A-570-893, ARP 09-10 (Aug. 12, 2011) (adopted in <u>AR5
Final Results</u>, 76 Fed. Reg. at 51,940) ("<u>AR5 I&D Mem.</u>") cmt. 2
(footnote continued)

challenged that choice of surrogate for the fifth review,[23] the issue was subsequently rendered moot and accordingly was ultimately not revisited in that proceeding.[24]  And when, in the context of Regal's seventh review revocation request, Commerce analyzed whether Regal sold subject merchandise at less than normal value during the fifth review period, Commerce again – despite the Court's decision in China Shrimp AR5 – used India as the surrogate country for its analysis of Regal's fifth review data.[25]

> However, as this Court also explained in AHSTAC I:
>
> In China Shrimp AR5, this Court held that Commerce acted arbitrarily in the fifth review by disregarding the concern that India's per capita GNI was nearly a third of China's during the relevant time period, whereas Thailand's per capita GNI was nearly identical thereto, despite the record evidence that the quality of the available datasets from these two potential surrogates was nearly indistinguishable.  . . . Disregarding the court's holding in China Shrimp AR5, Commerce did not consider or weigh the effect of the significant divergence between India and Thailand's respective economic comparability to China when

---

at 10.

[23] See Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __, 882 F. Supp. 2d 1366, 1376 (2012) ("China Shrimp AR5") (holding that "Commerce's stated reasoning regarding the surrogate country selection in [the fifth] review [did] not comport with a reasonable reading of the record").

[24] AHSTAC I, __ CIT at __, 70 F. Supp. 3d at 1333-34 (providing further detail in this regard).

[25] AR7 I&D Mem., supra note 1, cmt. 2 at 6.

determining, based on reasoning reiterated from the fifth review, that while the record provided adequate surrogate FOP datasets from both potential surrogates, the Indian dataset provided the best available information.[26]

The court therefore remanded Commerce's seventh review analysis of Regal's fifth review period sales.  By continuing to use Indian surrogate data to arrive at the comparison normal values for that period, based on reasoning reiterated from the original fifth review:

> [Commerce] ignore[d] this Court's repeated holdings that where, as here, adequate data is available from more than one country that is both at a level of economic development comparable to the NME and a significant producer of comparable merchandise, Commerce must weigh the relative merits of such potential surrogates' datasets in a way that does not arbitrarily discount the accuracy-enhancing value of sourcing surrogate data from a market economy whose economic development is as close as possible to that of the NME, and in that regard may provide the best available information.[27]

---

[26] AHSTAC I, __ CIT at __, 70 F. Supp. 3d at 1336-37 (quotation and alteration marks and citations omitted).

[27] Id. at 1337-38 (quotation marks, footnote, and citations omitted); see also id. at 1338-39, 42 ("During the fifth review, Commerce found that both India and Thailand fell within a range of GNI values comparable to the per capita GNI of China, that both of these potential surrogates were significant producers of comparable merchandise, and that there existed on the record sufficient, publicly available surrogate factor information for the majority of FOPs from both India and Thailand that was of roughly equal specificity, and that otherwise satisfied the agency's usual data-quality standards.  But in deciding which of these two datasets would provide the best available information, Commerce (both in the original fifth review and in examining Regal's fifth review pricing as part of its revocation analysis)

(footnote continued)

On remand here, Commerce reconsidered its surrogate country choice for the fifth review period, and "determined to select Thailand as the primary surrogate country [in light of] the proximity of Thailand's per capita GNI to the PRC's GNI and because the Thai surrogate value . . . data used to value Regal's [FOPs] is superior."[28]  With respect to one of the inputs, however – shrimp feed – the agency found that the Thai values were aberrational, and therefore unreliable, and accordingly determined to use alternative data from a secondary

---

categorically and formulaically disregarded the evidence that the Indian data came from a country whose per capita GNI was barely a third of China's, whereas the Thai data was from an economy whose per capita GNI was virtually identical to China's. Commerce's refusal to account for the accuracy-enhancing value of relative GNI proximity when evaluating the relative merits of alternative satisfactory datasets, to determine which set constitutes the best available surrogate value information, is arbitrary and, therefore, unreasonable.  . . .  Accordingly, the agency's reliance in this revocation proceeding upon its original fifth review analysis of surrogate dataset alternatives is not supported by substantial evidence, and must therefore be remanded for reconsideration.") (internal quotation and alteration marks, footnote, and citations omitted).

[28] Remand Results, ECF No. 65, at 1; see also id. at 7 ("[A] comparison of the [fifth review period] per capita GNI of India, $1,070, Thailand, $2,840, and the PRC[,] $2,940, indicates that Thailand's per capita GNI is closer to the PRC's per capita GNI than India's per capita GNI.  For this reason, and for the data considerations explained below, we now rely on Thai [surrogate value] data to value Regal's inputs in [the fifth review period].").

surrogate country – Indonesia.[29]  AHSTAC now challenges this latter determination.[30]

Because Commerce protests AHSTAC I,[31] the court will first review its prior holding.[32]  Accordingly, following a brief statement of the relevant standard of review, this opinion will discuss AHSTAC I in light of the Remand Results.  The court will then address AHSTAC's challenge to the Remand Results.

## STANDARD OF REVIEW

The court upholds Commerce's antidumping determinations on remand if they are in accordance with law, consistent with the court's remand order, and supported by

---

[29] Id. at 11-13.

[30] Pl.'s Br., ECF No. 70, at 6-14.

[31] See Remand Results, ECF No. 65, at 1 ("[P]ursuant to [AHSTAC I], we have, under protest, reconsidered the information on record and determined to select Thailand as the primary surrogate country . . . .") (citing Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003)); id. at 7 ("[Commerce] respectfully disagrees with the Court's holding that the Department must consider the relative GNI differences of potential surrogate countries . . . .").

[32] Cf. GPX Int'l Tire Corp. v. United States, __ CIT __, 942 F. Supp. 2d 1343, 1348 n.2 (2013) ("The only legitimate purpose of registering a protest in a remand determination is to preserve a particular issue for appeal where the agency has been compelled to take a particular step that results in an outcome not of its choosing.").

substantial evidence.[33]  Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to

support a conclusion,"[34] and the substantial evidence standard of

review "can be translated roughly to mean 'is [the

determination] unreasonable?'"[35]

**DISCUSSION**

I. *AHSTAC I* and the *Remand Results*

        In making its protest, Commerce mischaracterizes the

court's holding in AHSTAC I.  According to Commerce, AHSTAC I

requires the agency, in all instances, to "consider the relative

GNI differences of potential surrogate countries that [Commerce]

considers to be at the same level of economic comparability."[36]

Instead what the court held in AHSTAC I is that, on the

particular record presented here – i.e., where both India and

---

[33] See 19 U.S.C. § 1516a(b)(1)(B)(i); Camau Frozen Seafood
Processing Imp. Exp. Corp. v. United States, __ CIT __,
968 F. Supp. 2d 1328, 1334 (2014).

[34] Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)
(citations omitted).

[35] Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed.
Cir. 2006) (citation omitted, alteration in the original);
On-Line Careline, Inc. v. America Online, Inc., 229 F.3d 1080,
1085 (Fed. Cir. 2000) ("The substantial evidence standard
requires the reviewing court to ask whether a reasonable person
might find that the evidentiary record supports the agency's
conclusion.") (citations omitted).

[36] See Remand Results, ECF No. 65, at 7.

Thailand satisfied the statutory criteria of economic comparability to the PRC and significant production of comparable merchandise, and where the quality and specificity of the respective Indian and Thai potential surrogate datasets were materially indistinguishable – Commerce unreasonably concluded that relative per capita GNI proximity to the PRC was entirely irrelevant when choosing between these otherwise indistinguishable datasets.[37]

As the court explained in AHSTAC I, Commerce's conclusion "that significant 'differences of quality of data sources' adequately support the agency's selection of Indian rather than Thai surrogate values" was not supported by the record evidence.[38]  Specifically, as Commerce acknowledges, "the record contain[ed] publicly available [fifth review period] surrogate factor information for the majority of FOPs from both India and Thailand," and "the Indian and Thai import statistics did not allow [the agency] to distinguish between data from the two countries."[39]  Nevertheless, claiming an unfounded lack of

_____

[37] AHSTAC I, __ CIT at __, 70 F. Supp. 3d at 1337-42.

[38] Id. at 1339 (quoting AR7 I&D Mem., *supra* note 1, cmt. 2 at 10).

[39] Remand Results, ECF No. 65, at 8 (citing AR5 Final Results, 76 Fed. Reg. 51,940, and accompanying AR5 I&D Mem., *supra* note 22, cmt. 2); see also AHSTAC I, __ CIT at __,
(footnote continued)

specificity in the Indian data, Commerce determined, in the
original fifth review, that the Indian data provided the "best
available information."[40]  Commerce then adopted this fifth
review reasoning when analyzing Regal's fifth review sales in

---

70 F. Supp. 3d at 1338 ("During the fifth review, Commerce found
that both India and Thailand fell within a range of GNI values
comparable to the per capita GNI of China, that both of these
potential surrogates were significant producers of comparable
merchandise, and that '[t]here exist[ed] on the record
sufficient, publicly available surrogate factor information for
the majority of FOPs from both India and Thailand' that was 'of
roughly equal specificity,' and that otherwise satisfied the
agency's usual data-quality standards.") (quoting AR5 I&D Mem.,
supra note 22, cmt. 2 at 7 (alterations in AHSTAC I)).

    Indeed the two datasets were so nearly indistinguishable
that Commerce resorted to "minute, seemingly hair-splitting
differences" to determine the Indian data to be superior –
finding that the Indian data for shrimp larvae (the critical
input used by the sole mandatory respondent in the original
fifth review but not used at all by Regal), though also of very
similar quality to the Thai shrimp larvae data, did not specify
the species of shrimp to which they pertained, whereas the Thai
data were specific to a species of shrimp that the mandatory
respondent in the fifth review did not produce. AHSTAC I,
__ CIT at __, 70 F. Supp. 3d at 1340.

    Commerce also attempted to distinguish the two datasets by
determining that the Indian financial statement on record more
closely approximated Regal's experience, which was that of an
integrated producer (i.e., a shrimp farmer as well as shrimp
processor). Id. at 1341.  But as the court noted in AHSTAC I,
and as Commerce acknowledged in the Remand Results, this
distinction between the datasets was not supported by the record
because in fact the record contained evidence that the Thai
financial statement was also from an integrated producer. Id.;
Remand Results, ECF No. 65, at 9-10.

[40] See AHSTAC I, __ CIT at __, 70 F. Supp. 3d at 1336, 1338-40;
19 U.S.C. § 1677b(c)(1).

the context of the seventh review revocation proceeding.[41]  In

this context, the court held that Commerce acted unreasonably

when, *in choosing between otherwise essentially*

*indistinguishable datasets*, the agency "completely (and

categorically) ignored the *biggest* difference in quality between

the two datasets, which is that the Thai data was from a market

economy that very nearly mirrored China's level of economic

development . . ., whereas the Indian data reflected values

present in an economy whose per capita GNI was multiple orders

of magnitude lower than China's."[42]  Thus while Commerce is

_____

[41] See AHSTAC I, __ CIT at __, 70 F. Supp. 3d at 1336-37
("Defendant argues that, in revisiting the issue in the context
of Regal's revocation request, Commerce recognized that the
Court had previously remanded Commerce's fifth review primary
surrogate country selection, and that Commerce therefore
reconsidered its surrogate country selection for the limited
purpose of evaluating Regal's revocation request.  But in fact
the agency itself explicitly states that Commerce did *not*
reconsider this matter.  Specifically, Commerce explained that
because it ultimately was not required to respond to the
surrogate country issue, *Commerce did not reexamine the issue of*
*surrogate country selection and therefore continues to find*
*India to be a reliable source for surrogate values* for the
calculation of normal value for the period covered by the fifth
review.") (emphasis in AHSTAC I) (quotation and alteration marks
and citations omitted).

[42] Id. at 1341 (emphasis in original); see also id. at 1341 n.67
(noting Commerce's policy that "'the closest country to [an
NME]'s level of economic development' is the country whose per
capita GNI most closely approximates that of the NME") (quoting
Antidumping Methodologies in Proceedings Involving Non-Market
Economy Countries: Surrogate Country Selection and Separate
Rates, 72 Fed. Reg. 13,246, 13,247 (Dep't Commerce Mar. 21,
                                            (footnote continued)

correct that the statute does not require the agency to choose surrogate FOP data from a country that is *most* economically comparable to the NME[43] – because the most economically comparable country will not necessarily always provide the best available information – nevertheless where the competing datasets are otherwise indistinguishable, Commerce acts unreasonably if it "arbitrarily discount[s] the accuracy-enhancing value of sourcing surrogate data from a market economy whose economic development is as close as possible to that of the NME, and in that regard may provide the 'best available information.'"[44]

In protesting (its own misinterpretation of) the court's holding, Commerce emphasizes its policy of "sequential

---

2007) (alteration in AHSTAC I)).

[43] Remand Results, ECF No. 65, at 5-6 (relying on 19 U.S.C. §§ 1677b(c)(1), (4)).

[44] AHSTAC I, __ CIT at __, 70 F. Supp. 3d at 1337-38 (quoting 19 U.S.C. § 1677b(c)(1)) (additional citations and footnote omitted); see also id. at 1336 ("In China Shrimp AR5, this Court held that Commerce acted arbitrarily in the fifth review by disregarding the concern that India's per capita GNI was nearly a third of China's during the relevant time period, whereas Thailand's per capita GNI was nearly identical thereto, despite the record evidence that the quality of the available datasets from these two potential surrogates was nearly indistinguishable.") (quotation and alteration marks and citations omitted).

consideration" of the surrogate country eligibility criteria.[45]

Specifically, Commerce's policy is that the agency first

considers economic comparability, creating a list of potential

surrogates that are all "at a level of economic development

comparable to that of the [NME],"[46] as required by statute.[47]

Next, Commerce analyzes which of the countries on that list

produce comparable merchandise to that covered by the proceeding

in question.[48]  Then, the agency determines which of those

countries are "significant" producers of such merchandise.[49]  And

finally, "if more than one country has survived the selection

process to this point," then Commerce will choose from among the

survivors "the country with the best [FOP] data."[50]

      As applied here, Commerce Policy 4.1 directs the

agency to categorically disregard the relative per capita GNI

---

[45] Remand Results, ECF No. 65, at 5 (quoting Import Admin., U.S.
Dep't Commerce, Non-Market Economy Surrogate Country Selection
Process, Policy Bulletin 04.1 (2004), available at
enforcement.trade.gov/policy/bull04-1.html (last visited
Jan. 15, 2016) ("Commerce Policy 4.1")).

[46] 19 U.S.C. § 1677b(c)(4)(A).

[47] See Commerce Policy 4.1, supra note 45, at "Economic
Comparability."

[48] Id. at "Comparable Merchandise."

[49] Id. at "Significant Producer"; see 19 U.S.C. § 1677b(c)(4)(B).

[50] Id. at "Data Considerations."

differences among the potential surrogates once the initial list of countries satisfying the threshold economic comparability criterion is generated.[51]  In particular, this policy requires the agency to continue to disregard the potential surrogates' relative per capita GNI proximity to the per capita GNI of the NME even where, as in China Shrimp AR5 and AHSTAC I, not only did more than one country survive all of the steps of the policy's sequential analysis, but the quality of those countries' respective FOP datasets was materially indistinguishable.  In such cases, the categorical application of Commerce Policy 4.1 leads to the unreasonable result rejected by the court in AHSTAC I and China Shrimp AR5 where, forced to choose among two potential surrogates on the basis of data quality distinctions alone, "Commerce concluded that Indian data were superior to Thai data essentially based on a finding that a subset of the Indian data [was] more vague than its counterpart within the Thai data"[52] (because, although the Indian data likely

---

[51] See id. at "Economic Comparability" (providing that once the agency generates the "list of potential surrogate countries that are at a comparable level of economic development to the NME country," the countries on this list should thereafter "be considered equivalent in terms of economic comparability") (footnotes omitted).  Commerce's sole exception to this sequence is not relevant here. See id. at "Exceptions to the Sequencing Procedure."

[52] China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1376
                                          (footnote continued)

also pertained to a different species of shrimp than the one produced by the sole mandatory respondent in the original fifth review, the Indian data, unlike the Thai data, did not explicitly confirm this[53]), while entirely disregarding "the concern that India's per capita GNI was nearly a third of China's, whereas Thailand's per capita GNI was nearly identical thereto."[54]   In such cases, the categorical application of Commerce Policy 4.1 may therefore lead the agency to a choice of surrogate FOP values that does not comport with a reasonable reading of the record evidence, which is precisely what this Court held in China Shrimp AR5 and AHSTAC I.   Accordingly, in cases where a strict application of Commerce Policy 4.1 would lead to an unreasonable result – such as where more than one potential surrogate satisfies all threshold criteria and their respective FOP datasets are materially indistinguishable – Commerce must consider all important aspects of what constitutes "the best available information"[55] including, where appropriate,

_____

(citation omitted).

[53] See id. at n.15.

[54] Id. at 1376 (citation omitted).

[55] 19 U.S.C. § 1677b(c)(1); cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (stating that an agency acts arbitrarily when it fails to "consider an important aspect of the problem").

the potential surrogates' relative GNI proximity to the NME.

        Despite its protest, however, on remand Commerce
reexamined the fifth review period Indian and Thai surrogate FOP
datasets and found that, unlike the original fifth review (where
the datasets were compared to the production experience of the
mandatory respondent in that proceeding), when the datasets are
evaluated based on *Regal's* production experience, the two are no
longer materially indistinguishable, because in fact the
available Thai data better approximate Regal's production
factors.[56]  Specifically, as the court noted in AHSTAC I, the
critical input in Regal's production of subject merchandise
during the fifth review period was a different FOP than the
input used by the mandatory respondent in the original fifth
review analysis.[57]  Whereas the fifth review mandatory

---

[56] Remand Results, ECF No. 65, at 8-9; see AHSTAC I, __ CIT
at __, 70 F. Supp. 3d at 1336 (noting that Commerce did not
initially reconsider its original fifth review surrogate country
analysis in the context of Regal's company-specific revocation
proceeding); id. at 1340 (holding that "Commerce's reasoning
that its original analysis in the fifth review supports its
conclusion here that the Indian data [are] superior to the Thai
data because the former more closely match[] Regal's own FOPs
and production process is not supported by a reasonable reading
of the evidence") (citation omitted).

[57] AHSTAC I, __ CIT at __, 70 F. Supp. 3d at 1340; see Remand
Results, ECF No. 65, at 8 ("In the underlying AR5 Final Results,
. . . [Commerce] evaluated the surrogate factor information for
valuing shrimp larvae because shrimp larvae was the critical
input in the production of the subject merchandise for . . . the
                                        (footnote continued)

respondent's key input was shrimp larvae, for which the fifth
review Indian and Thai data were very nearly indistinguishable,[58]
Regal's key input was broodstock, an FOP for which the only
available data on record was from Thailand.[59]

Finding that broodstock accounts for a significant
portion of Regal's fifth review normal value calculation, and
that the Thai data were most specific with regard to this input,
Commerce therefore concluded on remand that the fifth review
Thai surrogate data offered the best available information,[60]
because Thailand satisfied the threshold statutory criteria of
economic comparability to China and significant production of

---

sole mandatory respondent in that review.  As noted by the
Court, Regal does not purchase shrimp larvae; rather, it uses
broodstock as its key physical input.") (citations omitted).

[58] See AHSTAC I, __ CIT at __, 70 F. Supp. 3d at 1340.

[59] See id.; Remand Results, ECF No. 65, at 8 ("The only available
[surrogate value] data on the record for broodstock is from
Thailand.") (citation omitted).  As noted in AHSTAC I, Commerce
also selected Thailand as the primary surrogate country for the
following sixth and seventh reviews, __ CIT at __,
70 F. Supp. 3d at 1340 n.60 (citations omitted), in which Regal
was a mandatory respondent, see supra note 14 (providing
relevant background and citations).

[60] See Remand Results, ECF No. 65, at 8-9 (explaining that
"[Commerce] favors one country over another on the basis of
surrogate value specificity where a surrogate value from one
country representing a significant portion of normal value is
more specific to a respondent's input," and choosing Thailand as
"the appropriate surrogate country" because Regal's "key
physical input" was broodstock and only Thai data was available
for that FOP) (citations omitted).

comparable merchandise,[61] and because "the specificity offered by
the Thai import data with respect to Regal's broodstock is more
specific to the input than any other [surrogate value] data on
the record."[62]

Accordingly, AHSTAC I's holding – that Commerce acts
unreasonably when, faced with two or more potential surrogate
datasets that are otherwise materially indistinguishable, the
agency categorically refuses to consider their relative GNI
proximity to the NME as a criterion for choosing among them – is
no longer implicated here, because Commerce no longer considers
the two datasets involved here to be materially
indistinguishable.  Commerce's protest is therefore irrelevant.
Moreover, because Commerce's conclusion – that Thailand offers
the best available surrogate FOP information for calculating
Regal's fifth review normal value because it satisfies the
threshold statutory criteria and presents the most specific data
with regard to a significant portion of Regal's normal value –
comports with a reasonable reading of the law and evidentiary
record, it is sustained.

---

[61] Id. at 5 n.16, 6-7; see 19 U.S.C. § 1677b(c)(4).

[62] Remand Results, ECF No. 65, at 9.

## II.  AHSTAC's Challenge to the *Remand Results*

AHSTAC challenges Commerce's selection, on remand, of a surrogate value for shrimp feed in its calculation of Regal's normal value for the fifth review period.[63]  With regard to this FOP, Commerce concluded that all available Thai values on the record were aberrational and thus unreliable,[64] and accordingly determined to use alternative data from a secondary surrogate country – Indonesia – to value this FOP.[65]  AHSTAC challenges this determination, arguing that Commerce instead should have used Thai shrimp feed data from the fourth review period, adjusted for inflation.[66]

While Commerce normally prefers to source all surrogate FOP values from a single ("primary") surrogate country, the agency will use data from a different surrogate country "if data from the primary surrogate country are unavailable or unreliable."[67]  "[W]here no suitable [surrogate

---

[63] Pl.'s Br., ECF No. 70, at 6-14; see Remand Results, ECF No. 65, at 11.

[64] Remand Results, ECF No. 65, at 11-12, 16.

[65] Id. at 13, 17.

[66] Pl.'s Br., ECF No. 70, at 7-14.

[67] Remand Results, ECF No. 65, at 10 (quoting Jiaxing Bro. Fastener Co. v. United States, __ CIT __, 11 F. Supp. 3d 1326, [1332-33] (2014) (quoting Issues & Decision Mem., Sodium Hexametaphosphate from the [PRC], A-570-908, ARP 10-11
(footnote continued)

value] is available from the primary surrogate country,"

Commerce uses surrogate data from "other countries that have

been found to be significant producers of comparable merchandise

and economically comparable to the NME country in question."[68]

Here, although the parties agree that Commerce may use secondary

surrogate country data when a particular FOP value from the

primary surrogate is unreliable/aberrational,[69] AHSTAC claims

---

(Sept. 19, 2012) (adopted in 77 Fed. Reg. 59,375 (Dep't Commerce
Sept. 27, 2012) (final results of antidumping duty
administrative review)) cmt. I at 4 ("It is [Commerce]'s well
established practice to rely upon the primary surrogate country
for all surrogate values, whenever possible, and to only resort
to a secondary surrogate country if data from the primary
surrogate country are unavailable or unreliable.") (citations to
prior determinations omitted))); see also Pl.'s Br., ECF No. 70,
at 6 (discussing Commerce's preference for "[u]sing *reliable*
data from the primary surrogate" to value all FOPs) (emphasis
added) (quoting Clearon Corp., 2013 WL 646390, at *5 (quoting
the agency's brief in that case))).

[68] Remand Results, ECF No. 65, at 12 (citing Issues & Decision
Mem., Tapered Roller Bearings and Parts Thereof, Finished and
Unfinished, from the [PRC], A-570-601, ARP 07-08 (Dec. 28, 2009)
(adopted in 75 Fed. Reg. 844 (Dep't Commerce Jan. 6, 2010)
(final results of the 2007-2008 administrative review of the
antidumping duty order)) ("TRBs from China") cmt. 3; Issues &
Decision Mem., Certain Cut-to-Length Carbon Steel Plate from
Romania, A-485-803, ARP 02-03 (Mar. 7, 2005) (adopted in 70 Fed.
Reg. 12,651 (Dep't Commerce Mar. 15, 2005) (notice of final
results and final partial rescission of antidumping duty
administrative review)) cmt. 3).

[69] See Remand Results, ECF No. 65, at 11 ("Although import
statistics obtained from [the Global Trade Atlas ('GTA')]
satisfy [Commerce]'s primary criteria for the suitability of
[surrogate values] in antidumping proceedings involving NME
countries, [Commerce] disregards GTA data for a certain factor,

(footnote continued)

that Commerce arbitrarily departed from its established practice

by valuing the shrimp feed surrogate FOP for Regal's fifth

review normal value calculation using data from Indonesia,[70] and

that Commerce's choice of the Indonesian data was not supported

by substantial evidence.[71]

> A. *Commerce Reasonably Determined That The Fifth Review Thai*
> *Value for Shrimp Feed Was Aberrational.*

Both parties agree that Commerce's established

practice for determining whether a given surrogate value is

aberrational, and therefore unreliable, is to "compare[] the

surrogate value in question to the [Gobal Trade Atlas] average

unit values calculated for the same period using data from the

other potential surrogate countries [that satisfied the

threshold statutory eligibility criteria], to the extent that

such data are available."[72]   Commerce also notes that the agency

---

either in whole or in part, where there is reason to believe
that the prices reflected in the import data may be unreliable.
[In such cases,] [Commerce] applies certain criteria to
determine whether a surrogate value is aberrational.")
(citing TRBs from China, *supra* note 68, cmt. 3); Pl.'s Br.,
ECF No. 70, at 6-7 (discussing Commerce's practice "for testing
the reliability of surrogate values alleged to be
aberrational").

[70] Pl.'s Br., ECF No. 70, at 4-10.

[71] Id. at 10-14.

[72] Remand Results, ECF No. 65, at 11 (citing Issues & Decision
Mem., Carbazole Violet Pigment 23 from the [PRC], A-570-892,
                                          (footnote continued)

has previously examined the primary surrogate's data for the FOP

value in question "over multiple years[,] to determine if the

current data appear aberrational with respect to historical

values."[73]

   Here, the Thai value for shrimp feed during the period

---

ARP 07-08 (June 21, 2010) (adopted in 75 Fed. Reg. 36,630 (Dep't
Commerce June 28, 2010) (final results of antidumping duty
administrative review)) ("CVP 23 from China") cmt. 4; Certain
Lined Paper Products from the [PRC], A-570-901, Investigation
(Aug. 30, 2006) (adopted in 71 Fed. Reg. 53,079 (Dep't Commerce
Sept. 8, 2006) (notice of final determination of sales at less
than fair value, and affirmative critical circumstances, in
part)) cmt. 5; see also Pl.'s Br., ECF No. 70, at 7 (quoting
Issues & Decision Mem., Multilayered Wood Flooring from the
[PRC], A-570-970, ARP 11-12 (May 9, 2014) (adopted in 79 Fed.
Reg. 26,712 (Dep't Commerce May 9, 2014) (final results of
antidumping duty administrative review; 2011-2012)) ("Wood
Flooring from China") cmt. 6 at 42 ("'To test the reliability of
the surrogate values alleged to be aberrational, [Commerce]
compare[s] the selected surrogate value for each FOP to the
[average unit values] calculated for the same period using data
from the other surrogate countries [Commerce] designated for
this review, to the extent that such data are available.'")
(quoting Issues & Decision Mem., Certain Hot-Rolled Carbon Steel
Flat Products from Romania, A-485-806, ARP 02-03 (June 6, 2005)
(adopted in 70 Fed. Reg. 34,448 (Dep't Commerce June 14, 2005)
(final results of antidumping duty administrative review))
("Hot-Rolled Carbon Steel from Romania") cmt. 2 at 19)).

[73] Remand Results, ECF No. 65, at 11-12 (citing Issues & Decision
Mem., Lightweight Thermal Paper from the [PRC], A-570-920,
Investigation (Oct. 2, 2008)  (adopted in 73 Fed. Reg. 57,329
(Dep't Commerce Oct. 2, 2008) (final determination of sales at
less than fair value)) cmt. 10; Issues & Decision Mem.,
Saccharin from the [PRC], A-570-878, ARP 02-04 (Feb. 13, 2006)
(adopted in 71 Fed. Reg. 7515 (Dep't Commerce Feb. 13, 2006)
(final results and partial rescission of antidumping duty
administrative review)) cmt. 5).

covered by the fifth review was 25.50 U.S. dollars per kilogram

("USD/kg").[74]  Of the other potential surrogate countries that

satisfied the threshold eligibility criteria, only three

provided usable shrimp feed data:  Indonesia, which had a value

for shrimp feed during the period covered by the fifth review of

1.23 USD/kg; India, which provided a fifth review value of

1.36 USD/kg for this FOP; and the Philippines, which provided a

fifth review value of 0.12 USD/kg for this FOP.[75]  Additionally,

the historical Thai values for this FOP varied significantly;

these values were 2.60 USD/kg (during the period covered by the

fourth review), 14.50 USD/kg (during the period covered by the

sixth review), and 26.83 USD/kg (during the period covered by

the seventh review),[76] such that "the Thai [average unit values]

for shrimp feed over the periods examined ranged from 2.6[0] to

---

[74] *Id.* at 12 (citing Ex. 2.b to Surrogate Factor Valuations for
the Prelim. Results, <u>Certain Frozen Warmwater Shrimp from the
[PRC]</u>, A-570-893, ARP 11-12 (Mar. 4, 2012), <u>reproduced in</u> App.
of Docs. in Supp. of Def.'s Resp. to Pl.'s Remand Comments,
ECF No. 76 ("Def.'s Remand App.") at Tab 3 ("<u>AR7 Prelim. SV
Mem.</u>"); [AHSTAC's] Submission of Publicly Available Info. to
Value Factors of Production, <u>Certain Frozen Warmwater Shrimp
from the [PRC]</u>, A-570-893, ARP 11-12 (Sept. 24, 2012),
<u>reproduced in</u> Def.'s Remand App., ECF No. 76 at Tab 1 ("<u>AHSTAC's
SV Submission</u>"), at Attach. 2).

[75] *Id.* at 13 (citing Ex. 2.b to <u>AR7 Prelim. SV Mem.,</u> ECF No. 76
at Tab 3).

[76] *Id.* at 12 (citing Ex. 2.b to <u>AR7 Prelim. SV Mem.,</u> ECF No. 76
at Tab 3; <u>AHSTAC's SV Submission</u>, ECF No. 76 at Tab 1,
at Attach. 2).

26.83 USD/kg, while the [average unit values] for the other
[potential surrogates satisfying the threshold eligibility
criteria] ranged from 0.13-0.51 USD/kg (Philippines),
0.92-1.29 USD/kg (Indonesia)[,] [and] 1.30-1.37 USD/kg (India)
during the same periods."[77]  Comparing the Thai fifth review
shrimp feed FOP value of 25.50 USD/kg to this historical data,
as well as to the contemporaneous fifth review values for this
FOP from the other potential surrogates, Commerce concluded that
the 25.50 USD/kg Thai fifth review value for shrimp feed was
aberrational and therefore unreliable.[78]

AHSTAC does not appear to contest Commerce's finding
that the Thai shrimp feed value for the fifth review period was
aberrational.  Instead, AHSTAC argues that Commerce should have
taken AHSTAC's suggestion to use the Thai shrimp feed value for
the *fourth* review period, 2.60 USD/kg, rather than the
contemporaneous fifth review value, and applied the aberration
test solely to that value, in isolation from the other

---

[77] Id. at 16 (citing Ex. 2.b to AR7 Prelim. SV Mem., ECF No. 76
at Tab 3; AHSTAC's SV Submission, ECF No. 76 at Tab 1,
at Attach. 2).

[78] Id. at 12 ("[B]ecause the Thai import data for shrimp feed
appears to be aberrational based on historical data and
contrasting against imports made during the [fifth review
period] by [the other potential surrogates], [Commerce] has
looked to other potential sources by which to value shrimp
feed.").

historical Thai data showing that the Thai feed values were

generally unreliably volatile during the relevant historical

period - i.e., AHSTAC argues that Commerce should have compared

the 2.60 USD/kg fourth review Thai value to the other fourth

review values available to find that it was not aberrational,

and then used that fourth review Thai value (adjusted for

inflation) for the fifth review normal value calculation.[79]

But although AHSTAC contends that "[t]he question

confronted by Commerce was whether the Thai [fourth review]

shrimp feed value was aberrational,"[80] in fact the question

before Commerce was whether the Thai *fifth* review value was

aberrational and, if so, which secondary surrogate FOP data

provide a reasonably reliable alternative.[81]  Here, consistent

---

[79] See Pl.'s Br., ECF No. 70, at 7-10.

[80] Id. at 9.

[81] See Remand Results, ECF No. 65, at 11, 14-15; CVP 23 from China, *supra* note 72, cmt. 4 at 13-14 ("[19 U.S.C. § 1677b(c)(1)] directs [Commerce] to use the 'best available information' on the record when selecting surrogate values with which to value FOPs.  In this regard, [Commerce]'s practice is to choose surrogate values that represent[, *inter alia*,] . . . prices that are *contemporaneous with the [period of review]* . . . .  If [the record] presents sufficient evidence to demonstrate [that] a particular surrogate value is not viable, *[Commerce] will assess all relevant price information on the record* . . . in order to accurately value the input in question.") (emphasis added); see also Wood Flooring from China, *supra* note 72, cmt. 6 (quoted in Pl.'s Br., ECF No. 70, at 7) at 40 (noting that among the "critical elements" of Commerce's test
                                          (footnote continued)

with AHSTAC's formulation of the agency's practice in this
regard, Commerce "compared the [Thai fifth review] surrogate
value for [the shrimp feed] FOP to the [average unit values]
calculated for the same period using data from the other
surrogate countries [that Commerce] designated for this
review."[82]  Commerce reasonably found that the 25.50 USD/kg Thai
fifth review value was aberrational when compared with the other
available fifth review surrogate values of 0.12, 1.23, and
1.36 USD/kg.[83]  As this finding is both reasonable and
uncontested,[84] it is sustained.  The next question before the
court, therefore, is whether Commerce's choice of the
alternative Indonesian surrogate data for this fifth review FOP
was reasonable.

> B.   *Commerce's Choice of Indonesian Fifth Review Shrimp
>      Feed Data Was Reasonable.*

        Having found the Thai fifth review shrimp feed data to
be unreliable, Commerce determined to value this FOP using

---

for surrogate FOP data reliability in NME proceedings is
"contemporane[ity] with the [period of review]").

[82] See Pl.'s Br., ECF No. 70, at 7 (quoting Wood Flooring from
China, *supra* note 72, cmt. 6 at 42 (quoting Hot-Rolled Carbon
Steel from Romania, *supra* note 72, cmt. 2 at 19));
Remand Results, ECF No. 65, at 12-13.

[83] See Remand Results, ECF No. 65, at 12-13.

[84] See *supra* note 79 and accompanying text.

contemporaneous data from Indonesia, which was the second
largest producer of comparable merchandise from the six
countries determined to be economically comparable to China, and
which provided the median available non-aberrational fifth
review value for this FOP.[85]  AHSTAC again argues that Commerce
should have chosen the fourth review Thai data, rather than the
contemporaneous Indonesian data, to substitute for the
aberrational fifth review Thai value.[86]

   As Commerce has explained its established practice,
however, "when a party claims that a particular surrogate is not
appropriate to value the FOP in question, [Commerce] has
determined that the burden is on that party to prove the
inadequacy of said [surrogate value] or, alternatively, to show
that another value is preferable."[87]  Here, relying on Commerce's
regulatory preference for valuing all FOPs using data from the
same surrogate country whenever possible,[88] AHSTAC claims that

---

[85] See Remand Results, ECF No. 65, at 13.

[86] See Pl.'s Br., ECF No. 70, at 10-14.

[87] TRBs from China, *supra* note 68, cmt. 2 at 17 (citations
omitted); see also Wood Flooring from China, *supra* note 72,
cmt. 6 (quoted in Pl.'s Br., ECF No. 70, at 7) at 40 ("When a
party claims that a particular [surrogate value] is not
appropriate to value a certain FOP, the burden is on that party
to provide evidence demonstrating the inadequacy of the
[surrogate value].") (citations omitted).

[88] See 19 C.F.R. § 351.408(c)(2) ("[In NME cases, Commerce]
                                        (footnote continued)

the fourth review Thai value for shrimp feed is preferable to
Commerce's chosen contemporaneous Indonesian value because all
the other fifth review period surrogate FOP values in this case
were from Thailand,[89] and the 2.60 USD/kg fourth review shrimp
feed value from Thailand was not aberrational,[90] but "simply at
the high end of a wide range of [contemporaneous] values for
[the other potential surrogate] countries."[91]  Commerce, however,
concluded that AHSTAC did not meet its burden to demonstrate
that the fourth review Thai value was preferable to the

---

normally will value all factors [of production] in a single
surrogate country."); Pl.'s Br., ECF No. 70, at 5 (quoting
Issues & Decision Mem., Certain Steel Nails from the [PRC],
A-570-909, ARP 10-11 (Mar. 5, 2013) (adopted in 78 Fed. Reg.
16,651 (Dep't Commerce Mar. 18, 2013) (final results of third
antidumping duty administrative review; 2010-2011)) cmt. 1.D.d
[at 13] ("It is most accurate to rely on factor costs from a
single surrogate country because sourcing data from a single
country . . . enables [Commerce] to capture the complete
interrelationship of factor costs that a producer in the primary
surrogate country faces.  [Commerce] only resorts to other
surrogate country information if the record does not contain a
value for a factor from the primary surrogate, or if a primary
surrogate country value on the record is determined, based on
record evidence, to be aberrational or unreliable.") (citation
omitted)).

[89] See, e.g., Pl.'s Br., ECF No. 70, at 10 (arguing that given
"Commerce's established practice and codified regulatory
preference for a single surrogate country," the Thai fourth
review value was preferable because "[Commerce] selected
Thailand as the surrogate country for purposes of calculating
normal values during the [fifth review period] in the remand").

[90] Id. at 8, 10-14.

[91] Id. at 8.

contemporaneous non-aberrational Indonesian value selected by
the agency, because the fourth review Thai value was (A) not
contemporaneous with the fifth review period under
consideration; and (B) "nested in the wider overall pattern of
great variability" over the course of the time periods examined
(the fourth through the seventh reviews), in stark contrast to
"the stability exhibited in the data from the other [potential
surrogate] countries" over the same time periods.[92]

      Specifically, Commerce "compared the shrimp feed
values over the same review periods with respect to the
potential surrogate countries relative to Thailand,"[93] comparing
the Thai fourth, fifth, sixth, and seventh review data to data
from the Philippines, India, and Indonesia (the other potential
surrogates satisfying the threshold eligibility criteria) for
the fourth, fifth, and sixth review periods.[94]  Based on this
analysis, Commerce concluded that "Indonesia has the best import
prices for shrimp feed during the [fifth review period] from
among the potential surrogate countries that are at [a
comparable] level of economic development [to] the PRC and are
significant producers of comparable merchandise," whereas "the

---

[92] Remand Results, ECF No. 65, at 16-17.

[93] Id. at 15.

[94] Id.

imports of shrimp feed into Thailand for the periods [of the fourth, fifth, sixth, and seventh reviews were] aberrational based on extreme [average unit value] volatility."[95]

Because "the Thai [average unit values] for shrimp feed over the periods examined ranged from 2.6[0] to 26.83 USD/kg, while the [average unit values] for the other [potential surrogates satisfying the threshold eligibility criteria] ranged from 0.13-0.51 USD/kg (Philippines), 0.92-1.29 USD/kg (Indonesia)[,] [and] 1.30-1.37 USD/kg (India) during the same periods,"[96] Commerce determined that given this "overall pattern of great variability, particularly [in light of] the stability exhibited in the data from the other [potential surrogate] countries," the "Thai import data for shrimp feed is unreliable as a whole."[97]  On the record presented here, this conclusion was not unreasonable.[98]  While AHSTAC argues that Commerce

---

[95] Id. at 15-16 (citing Ex. 2.b to AR7 Prelim. SV Mem., ECF No. 76 at Tab 3).

[96] Id. at 16 (citing Ex. 2.b to AR7 Prelim. SV Mem., ECF No. 76 at Tab 3; AHSTAC's SV Submission, ECF No. 76 at Tab 1, at Attach. 2).

[97] Id. (citing AR6 I&D Mem., supra note 14, cmt. 10; AR7 Prelim. Decision Mem., supra note 14, at 20-21 (unchanged in AR7 Final Results, 78 Fed. Reg. 56,209)).

[98] See Consol. Edison, 305 U.S. at 229 ("[Substantial evidence] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citations omitted); cf. Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)
                                        (footnote continued)

"diverge[d] from agency practice" by not considering the fourth

review Thai value in isolation from this wider pattern of

volatility relative to the other potential surrogates' data,[99] in

fact Commerce's practice is to consider all case-specific facts

and the totality of the evidence in order to select the

surrogate values presenting the best available information when

contemporaneous values from the primary surrogate are found to

be unreliable.[100]   Commerce has done so here, and the record as a

---

("[Substantial evidence] is something less than the weight of
the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence.")
(citations omitted).

[99] See Pl.'s Br., ECF No. 70, at 8-10, 14.

[100] Remand Results, ECF No. 65, at 14-15 ("When presented with
sufficient evidence to demonstrate a particular [surrogate
value] is aberrational, and therefore unreliable, *[Commerce]
will examine all relevant price information on the record . . .
in order to accurately value the input in question.*") (emphasis
added) (citing Issues & Decision Mem., Certain Frozen Fish
Fillets from the Socialist Republic of Vietnam, A-552-801,
ARP 11-12 (Mar. 28, 2014) (adopted in 79 Fed. Reg. 19,053 (Dep't
Commerce Apr. 7, 2014) (final results of antidumping duty
administrate review and new shipper review; 2011-2012)) cmt. V;
Issues & Decision Mem., Polyethylene Terephthalate Film, Sheet,
and Strip from the [PRC], A-570-924, ARP 12-13 (June 3, 2015)
(adopted in 80 Fed. Reg. 33,241 (Dep't Commerce June 11, 2015)
(final results of antidumping duty administrative review and
final determination of no shipments; 2012-2013)) cmt. 3);
cf., e.g., Mittal Steel Galati S.A. v. United States,
31 CIT 1121, 1124-25, 502 F. Supp. 2d 1295, 1299 (2007)
("Substantial evidence . . . requires weighing the totality of
the evidence, to [make] factual findings [that] are reasonable
when viewed in light of that complete record.") (citing Ta Chen
                                          (footnote continued)

whole reasonably supports the agency's conclusion.

        Accordingly, Commerce's determination to value the
shrimp feed FOP for the fifth review period using surrogate data
from Indonesia (as the agency also did with regard to that FOP
for the sixth and seventh review periods,[101] determinations that
are not contested here) is supported by substantial evidence,
and is therefore sustained.

**CONCLUSION**

        For all of the foregoing reasons, Commerce's <u>Remand
Results</u> are sustained.  Judgment will issue accordingly.


                                    /s/ Donald C. Pogue
                               Donald C. Pogue, Senior Judge


Dated: January 21, 2016
       New York, NY

---

Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335
(Fed. Cir. 2002); Nippon Steel, 458 F.3d at 1351).

[101] <u>Remand Results</u>, ECF No. 65, at 12 ("[Commerce also] found the
Thai [Global Trade Atlas] values for shrimp feed to be
aberrational in [the sixth and seventh reviews].") (citing
<u>AR6 I&D Mem.</u>, *supra* note 14, cmt. 10; <u>AR7 Prelim. Decision Mem.</u>,
*supra* note 14, at 20-21 (unchanged in <u>AR7 Final Results</u>, 78 Fed.
Reg. 56,209)); <u>id.</u> at 13 ("[Commerce] used the Indonesian
[surrogate value] for feed in [the sixth and seventh reviews].")
(citing <u>AR6 I&D Mem.</u>, *supra* note 14, cmt. 10; <u>AR7 Prelim.
Decision Mem.</u>, *supra* note 14, at 20-21 (unchanged in <u>AR7 Final
Results</u>, 78 Fed. Reg. 56,209)).